RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0127p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WILLIAM THOMAS GREGORY,
                    *Plaintiff-Appellee/Cross-Appellant*
                                        *(04-6482),*

                    *v.*                                    Nos. 04-5856/5859/6482

CITY OF LOUISVILLE; LOUISVILLE DIVISION OF
POLICE; HOPE GREER; DARRELL AMMON; WAYNE
KESSINGER; JAY PIERCE; EUGENE SHERRARD;
LUANNE THOMAS,
                    *Defendants-Cross-Appellees (04-6482),*

DAWN ROSS KATZ,
                    *Defendant-Appellant (04-5856)/*
                                        *Cross-Appellee,*
JOE CARROLL; STEVE CLARK; JOHN TARTER,
                    *Defendants-Appellants (04-5859)/*
                                        *Cross-Appellees,*
JOHN VANCE, et al.,
                                        *Defendants.*

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 01-00535—Thomas B. Russell, District Judge.

Argued: October 26, 2005

Decided and Filed: April 11, 2006

Before: SILER and CLAY, Circuit Judges; MILLS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Roger G. Wright, KENTUCKY STATE POLICE LEGAL OFFICE, JUSTICE & PUBLIC SAFETY CABINET, Frankfort, Kentucky, for Appellants. Lisa A. Schweickart, JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville, Kentucky, Barry C. Scheck, Deborah

---

[*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

1

L. Cornwall, COCHRAN, NEUFELD & SCHECK, New York, New York, James M. Herrick, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellees.   **ON BRIEF:** Roger G. Wright, KENTUCKY STATE POLICE LEGAL OFFICE, JUSTICE & PUBLIC SAFETY CABINET, Frankfort, Kentucky, Daniel Luke Morgan, COMMONWEALTH OF KENTUCKY, JUSTICE AND PUBLIC SAFETY CABINET, Frankfort, Kentucky, for Appellants. Lisa A. Schweickart, Paul V. Guagliardo, JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville, Kentucky, Barry C. Scheck, Deborah L. Cornwall, Nick J. Brustin, COCHRAN, NEUFELD & SCHECK, New York, New York, James M. Herrick, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, Larry D. Simon, SIMON & SIMON, Louisville, Kentucky, for Appellees.

CLAY, J., delivered the opinion of the court, in which MILLS, D. J., joined.  SILER, J. (pp. 29-31), delivered a separate opinion concurring in part and dissenting in part.

––––––––––––––––

## OPINION

––––––––––––––––

CLAY, Circuit Judge.  Plaintiff, William Thomas Gregory, and Defendants cross appeal March 29, 2004 and June 22, 2004 orders entered by the United States District Court for the Western District of Kentucky which ruled on the parties' cross-motions for summary judgment in this action by Plaintiff for violations of his civil rights under 42 U.S.C. § 1983 and various state laws.  The orders below dismissed Plaintiff's claims entirely against the municipal and supervisory Defendants, denied other Defendants absolute or qualified immunity, and dismissed certain claims as unsupported by the record.

For the reasons set forth below, this Court **AFFIRMS** in part and **REVERSES** in part the orders of the district court.

## I

## BACKGROUND

The series of events underlying this action surround Plaintiff's arrest and 1993 conviction on charges of rape, attempted rape, and burglary.  Plaintiff's conviction was vacated in 2000 after DNA tests established that the sole physical evidence linking Plaintiff to either of the crime scenes – several hairs – could not have come from Plaintiff.  All charges against Plaintiff were dismissed on August 25, 2000, after Plaintiff had spent more than seven years in custody.

### A.    SUBSTANTIVE FACTS

#### 1.    *The Assaults on Mrs. V and Ms. S*

Plaintiff's conviction stems from assaults on two women who lived in the same apartment complex as Plaintiff.  The first of these two assaults occurred on June 1, 1992, when "Mrs. V," a white woman, was awakened by an unknown, nude, black male standing over her bed.  This intruder, who wore a pair of the victim's pantyhose as a mask, struggled with the victim, choked her, fondled her breasts, and attempted to rape her.  Mrs. V reports that she fought off her attacker, managed to pull off the pantyhose, and scratched the attacker's face before he fled her apartment. Mrs. V. described her assailant as a black male, 30-40 years old, 5 feet 6 inches tall, with a stocky build and long, straight, oily or greasy hair.  Mrs. V also informed the police that her attacker had a very small, circumcised penis and had attempted to use a lubricant, which the police later

determined was Vaseline. The police later discovered that the attacker had disabled three telephones and stolen a television and a compact disc player from the apartment.

Mrs. V's neighbors and mother, all white, saw her immediately after the attack. When Mrs. V gave the police a description of her attacker, the neighbors and her mother informed the police that they thought the description matched that of Plaintiff.

Later in the day on June 1, 1992, Mrs. V saw Plaintiff in the apartment complex, and police were called to the area. Several officers of the Louisville Division of Police ("LDP") went to Plaintiff's apartment, told Plaintiff that they were investigating an incident unrelated to Mrs. V's assault, and were allowed to search Plaintiff's apartment. Police found no evidence linking Plaintiff to the assault, either in the apartment or on Plaintiff's person (such as marks or injuries).

Two days later, Clark and Carroll, LDP officers, showed Mrs. V a photopak that included Plaintiff's picture. Mrs. V initially made no identification, but when asked to pick a photo which resembled her attacker, Mrs. V chose a photo other than Plaintiff's. When Mrs. V's mother looked through the photopak she identified Plaintiff as living in the same apartment complex.

Later on the same day that Mrs. V had reviewed the photopak, Mrs. V's mother called police to tell them that Mrs. V had seen Plaintiff at the apartment complex and was now sure that he was her assailant. With the assistance of Clark and Carroll, Mrs. V swore out a criminal complaint, pursuant to which Clark and Carroll obtained a warrant for Plaintiff's arrest.

At a preliminary hearing on June 15, 2002, Clark testified on direct examination that Mrs. V had twice identified Plaintiff. Clark was presumably referring to Mrs. V's two sightings of Plaintiff at the apartment complex, once prior to Mrs. V's failure to pick Plaintiff out of a photopak, and once after the photopak procedure. On cross-examination Clark revealed that Mrs. V had failed to pick Plaintiff out of a photopak, but did not reveal that Mrs. V actually picked another photo. When asked if the police had any evidence against Plaintiff other that Mrs. V's identification, Clark responded "Not at this time." (J.A. at 1301.) When asked if Mrs. V had given a physical description of her assailant, Clark responded: "That's correct and it fits [Plaintiff]." (J.A. at 1301.) When Plaintiff moved to dismiss for lack of probable cause, the judge denied the motion, but noted that "because of the extremely minimal burden on the Commonwealth I'm gonna have to find probable cause but I'll state for the record it's just barely." (J.A. at 1302.) Plaintiff was released on bail.

According to the testimony of Clark and Carroll at Plaintiff's criminal trial, following Plaintiff's arrest, Plaintiff made a telephone call to a friend and told the friend about the items stolen from Mrs. V's apartment. Plaintiff claims that, prior to the telephone call, Carroll and Clark told him what had been stolen from the apartment; Carroll and Clark, however, deny that they ever told Plaintiff what had been stolen. Carroll and Clark recorded the overheard telephone conversation in their contemporaneous investigative notes.

In July 1992, Dawn Katz, in her role as Examiner with the Kentucky State Police Crime Laboratory, examined hairs found in the pantyhose Mrs. V's attacker had been wearing as a mask. Katz compared these hairs to samples taken from Plaintiff. In her laboratory notes, Katz records the hairs found in the pantyhose as "# NH & 1 CH." (J.A. at 557.) The notes appear as if the number preceding the "NH" (for negroid hairs) had been scratched out ("CH" stands for caucasoid hair). Katz's notes further record that "5 HHs" (head hairs) were similar to Plaintiff's hair, and later reports that Plaintiff's head hair standard was similar in color and microscopic characteristics with the Negroid hairs recovered from the pantyhose. No mention is made anywhere in Katz's notes of additional negroid hairs found on the pantyhose. Katz's deposition for this instant action revealed that Katz had actually found 7 negroid head hairs on the pantyhose, only 5 of which she found similar to Plaintiff's hair. Katz testified in the deposition that before she sent the slide with the hairs

to the Innocence Project in 1996, Katz checked to insure there were still 7 hairs on the slide because she remembered that there had been seven hairs taken from the pantyhose. Katz testified that she was not and still is not in the habit of recording dissimilarities.

While Plaintiff was out on bail, a second assault occurred in the same apartment complex on July 19, 1992, on a 71 year old white woman, "Ms. S." Ms. S awoke to a nude, black male in her apartment. Armed with a kitchen bread knife, the man raped Ms. S with the aid of hand lotion as a lubricant, french-kissed her, and stole items before leaving. Police also discovered that the intruder had drank from several items of liquor in Ms. S's apartment. A sexual assault kit from Ms. S, processed by Katz, contained no secretions or other pertinent evidence.

Ms. S described her attacker as a black male, late 20s to mid 30s, with a slender to small build, short black and curly hair, with a round, clean-shaven face. Mrs. S also indicated the attacker felt very greasy around the neck and shoulders.

Defendants Tarter and Greer, LDP officers, investigated the attack on Ms. S. Tarter and Greer visited Ms. S with a photopak that included Plaintiff's picture and five others. Only Plaintiff's photo had a recent date on it ("06:03:92 "), but Ms. S was unable to make any identification from the photopak. Thereafter, Tarter and Greer asked Plaintiff to come in for a line-up in the presence of Ms. S. By the time Plaintiff and his attorney arrived at the station, Tarter had taken no affirmative steps, beyond securing the presence of Ms. S, to effectuate a line-up. Line-ups take at least an hour to arrange and can take days if the suspect has unique characteristics. Neither Tarter nor Greer informed Plaintiff, Plaintiff's counsel, LDP supervisory staff, or the prosecutor that Ms. S had failed to pick Plaintiff's picture out of a photopak or that Ms. S's description of her assailant was inconsistent with Plaintiff's physical appearance.

After Plaintiff arrived at the station anticipating a line-up, Tarter instead asked Plaintiff to agree to a one-on-one show-up with Ms. S. Plaintiff agreed and signed a preprinted "waiver" form consenting to the show-up.[1] At the one-on-one show-up, after viewing Plaintiff for several moments, Ms. S requested to have Plaintiff repeat the words uttered by her rapist. Tarter asked Plaintiff to repeat, "Don't scream. I have a 14 year old daughter." (J.A. at 1887-88.) Ms. S told the police that Plaintiff was her attacker based upon his eyes. Ms. S later said at trial that "I think I said I thought they were kinda grey." (J.A. at 1747.) Plaintiff's criminal counsel was never informed of this statement by Ms. S. The police arrested Plaintiff immediately following Ms. S's identification.

Plaintiff is a 5 foot, 11½ inches tall black man with brown eyes. At the time of his arrest, Plaintiff was 44 years old, had a potbelly, and wore a full beard. Plaintiff had worn the beard continually for 10 years. Plaintiff additionally has an average-sized penis, measuring 5½ inches in the flaccid state.

---

[1]The "waiver" form read:

I, William Thomas Gregory, hereby waive my right and privilege to stand in a line-up for a possible identification concerning crimes or offenses for which I am a suspect. I hereby agree to stand in a one-on-one system of identification before witnesses or victims of crimes or offenses of which I am a suspect for purposes of identification. I have not been threatened or promised anything by any officers or detectives of the Louisville Division of Police to persuade me to sign this form freely and voluntarily. I am fully aware of the nature of this process and realise [sic] the consequences of an identification and intelligently waive my right to a police line-up.

(J.A. at 2007.)

Tarter later testified that he believed that if he had told Plaintiff and Plaintiff's counsel that Ms. S had failed to pick Plaintiff out of a photopak, Plaintiff would not have agreed to the one-on-one show-up.

### 2.    *The Assault on Ms. B*

On August 14, 1992, while Plaintiff was jailed for the Ms. S assault, a third woman was sexually assaulted not far from the apartment complex where the first two assaults occurred. The white victim, "Ms. B," awoke to find a nude black male standing above her and holding a knife. The attacker beat her, used lubricant (hand lotion) in a sexual assault, used distinctive language, drank liquor, and stole electronics. Ms. B reported her assailant as being a black male about 5 feet, 8 inches tall, muscular build, short hair, aged about 30 to 35, with a thin mustache. In a subsequent photopak array which included Plaintiff's photo, Ms. B was unable to identify her assailant.

A copy of the composite drawing created from Ms. B's description of her assailant was placed in the LDP police files for the Mrs. V and Ms. S assaults. When Plaintiff's counsel remarked upon the poster in front of Tarter, Tarter replied, "that's been misfiled; that's not supposed to be in that file; that doesn't have anything to do with [the case about Mrs. V and Ms. S]." (J.A. at 2009).

### 3.    *The Assault on Ms. R*

On June 28, 1993, about one month before Plaintiff's trial on the Mrs. V and Ms. S assaults and while Plaintiff was in state custody, a fourth assault took place that was similar to those assaults on Mrs. V, Ms. S, and Ms. B. A white, female victim ("Ms. R") awoke to find a black male, nude from the waist down, on top of her and armed with a knife. The attacker used a lubricant in a sexual assault on Ms. R, drank liquor, and stole Ms. R's belongings (but not electronics). Ms. R described her assailant as a black male, aged 35-40, 5 feet, 9 inches tall, skinny, and with a small penis.

Tarter was one of the officers involved in the investigation of Ms. R's assault. Tarter was present when Ms. R described her assailant and the events surrounding the assault. A suspect was arrested in the Ms. R assault following a positive photopak identification. No evidence indicates that Tarter or anyone in the LDP took measures to explore whether Ms. R's assault was connected to the assaults on Mrs. V and Ms. S.

### 4.    *Grand Jury Proceedings*

At the December 4, 1992 grand jury hearing for the assault on Mrs. V, Clark testified to the two identifications made by Mrs. V but did not mention Mrs. V's inability to pick Plaintiff's photo from the photopak, the inconsistency between Mrs. V's initial description and Plaintiff's physical appearance, or that two more assaults with similar characteristics had taken place since Plaintiff had been in jail.

At the August 14, 1992 grand jury for the assault on Ms. S, Tarter testified to Ms. S's identification and the similarities between the Mrs. V and Ms. S assaults, but did not mention Ms. S's inability to pick Plaintiff's photograph from the photopak, the inconsistency between Ms. S's initial description and Plaintiff's appearance, or that two more assaults with similar characteristics had taken place since Plaintiff had been in jail.

### 5.    *Plaintiff's Trial for the Assaults on Mrs. V and Ms. S*

A joint trial for the Mrs. V and Ms. S assaults began on August 10, 1993. For the assault on Mrs. V, prosecutors presented an in-court identification by Mrs. V, testimony from Clark and Carroll about Plaintiff's knowledge of the stolen items from Mrs. V's apartment, and Katz's testimony about the hairs. Katz's testimony went as follows:

Q.      Do you know approximately how many hairs you found in [the pantyhose]?

A.      I found five hairs.

. . . .

Q.      Could you please explain . . . your findings as a result of the comparison of the hairs from the pantyhose and the hairs from the defendant?

A.      Well, I determined that the hairs I found in the pantyhose were similar in color, microscopic characteristics from the head hair standard from [Plaintiff].

Q.      That is a term that you all use when you make a match, that they are similar?
            MR. POLK: Objection, Judge.
            MR. SCHOERING: That is fine.

Q.      Ma'am, what does that mean?

A.      That means that I have – I have looked at the standard, the head hair standard I'm given first and I have written down a range of characteristics on a worksheet that I have . . . .

. . . .

Q.      Ma'am, do most African-American hairs that you have examined have medullas?

A.      Well, it seems to be a pretty common characteristic in the negroid race. As a matter of fact, they usually have a very prominent medulla . . . .

Q.      And did the samples taken from the pantyhose have a medulla?

A.      These hairs had no medulla. That was one of the characteristics they were lacking.

Q.      Did the samples that you obtained from [Plaintiff] have a medulla?

A.      No, they did not.

(J.A. at 2460-63.)

        The evidence in Ms. S's case was largely derivative of the evidence against Plaintiff for the assault on Mrs. V. Prosecutors relied on Ms. S's show-up identification and the similarities between the two crimes. No other evidence placed Plaintiff at the scene of the assault on Ms. S. Plaintiff's roommate testified that Plaintiff had been in their apartment with him at the time of the assault on Ms. S.

        At trial, Plaintiff's attorney argued that the third crime against Ms. B pointed to a different perpetrator for all three crimes. Plaintiff's attorney was unable to point to significant additional evidence supporting the alternate perpetrator theory, however, because Plaintiff's attorney had no knowledge of the fourth assault.

        The trial judge held that Plaintiff had waived the right to contest Ms. S's identification because of Plaintiff's consent to the one-on-one show-up. The court noted that "[w]e all agree that

the [show-up] procedure would have been unduly suggestive had there not been a waiver . . . . There would have been serious problems with it."  (J.A. at 1906-07.)

The jury found Plaintiff guilty of all charges.  In October 1993 the court sentenced Plaintiff to a total of 70 years incarceration.

### 6.      *Plaintiff's Exoneration*

DNA testing in 1999 and 2000  revealed that none of the hairs recovered from the pantyhose came from Plaintiff.  All charges against Plaintiff were dismissed on August 25, 2000, after Plaintiff had spent more than seven years in custody.

## B.      PROCEDURAL HISTORY

On August 24, 2001, Plaintiff brought the instant action in the Circuit Court of Jefferson County, Kentucky, claiming numerous violations of his civil rights under 42 U.S.C. § 1983 and various state laws by the investigatory teams involved in his 1993 criminal conviction.  In his initial complaint Plaintiff named the City of Louisville (the "City") and the Louisville Division of Police ("LDP") as governmental Defendants.  Plaintiff further named local officials in their official and individual capacities: Joe Carroll ("Carroll"), a police officer/detective with LDP; Steve Clark ("Clark"), a police officer/detective with LDP; Hope Greer ("Greer"), a police officer/detective with LDP; John Tarter ("Tarter"), a police officer/detective with LDP; and unknown defendants Jane/John Does, supervisors and/or policymakers associated with the City and/or LDP.  Finally, Plaintiff named state employees Dawn Ross Katz ("Katz"), a Kentucky State Police Crime Laboratory Examiner, and unknown defendants Jane/John Does, supervisors, employees, or policymakers associated with the Kentucky State Police Crime Laboratory, all in their individual capacities.

Defendants removed this case to the United States District Court for the Western District of Kentucky  on September 17, 2001.  Shortly thereafter, on October 19, 2001, Plaintiff requested a "Warning Order" to be able to serve his unnamed defendants, pursuant to Kentucky Rules of Civil Procedure 4.05, which provides:

> If a party sought to be summoned is . . . (e) an individual whose name or place of residence is unknown to the plaintiff the clerk shall forthwith, subject to the provisions of Rule 4.06, make an order upon the complaint warning the party to appear and defend . . . .

Kent. R. Civ. P. 4.05.  Warning Order counsel was unsuccessful, however, and reported back to the district court without having served the substitute real Defendants.

Plaintiff  asked for leave to file a Second Amended Complaint in order to name his Jane and John Doe defendants on February 28, 2002, which the court granted on April 12, 2002.  In his Second Amended Complaint Plaintiff named, in their individual and official capacities, the following individual Defendants of the LDP in lieu of his previously unnamed defendants: Darrell Ammon ("Ammon"), a Detective Sergeant with supervisory authority over Carroll and Clark; Wayne Kessinger ("Kessinger"), a police officer/detective with supervisory authority over Carroll and Clark; Jay Pierce ("Pierce"), a police officer/detective with supervisory authority over Tarter and Greer; and Eugene Sherrard  ("Sherrard"), a police officer/detective with supervisory authority over Tarter and Greer.  In addition, Plaintiff named, in their individual capacities, the following individual Defendants of the Kentucky State Police in lieu of his previously unnamed defendants: Luanne Thomas ("Thomas"), Katz's immediate supervisor; John Vance ("Vance");  L.E. Burgin ("Burgin"); and Roy Sturgill ("Sturgill").  Finally, Plaintiff named Billy G. Wellman ("Wellman"), the Commissioner of the Kentucky State Police, in his individual and policymaking capacities.

Plaintiff alleged eleven counts in all, many against multiple Defendants. Plaintiff prayed for compensatory monetary damages, punitive damages, and costs. Plaintiff also requested a jury trial.

Plaintiff and Defendants filed cross-motions for summary judgement in late 2003. The district court issued its ruling on those motions on March 29, 2004, making various findings of absolute or qualified immunity and the existence of genuine issues of material fact. The order resulted in a dismissal of all claims against all Defendants, with the exception of several claims against Tarter and Katz. The March 29, 2004 order left for a jury trial the following claims: 1) claims against Katz for *Brady* violations arising from the hair examination and failure to disclose the results, 2) claims against Tarter based on a suggestive line-up, malicious prosecution, and false arrest/imprisonment under federal and state law, and 3) claims against Tarter for *Brady* violations for failing to disclose a fourth, similar rape which took place while Plaintiff was in custody.

Plaintiff and remaining Defendants filed Motions for Reconsideration, which the district court granted in part, finding that its earlier ruling finding absolute immunity for Defendants Clark, Carroll, and Katz for their pretrial acts was legal error. The district court therefore reinstated the following claims on June 21, 2004: 4) claims against Katz for fabrication of evidence and 5) claims against Carroll and Clark for fabrication of evidence.

Katz filed an interlocutory appeal on July 7, 2004 under this Court's exception to the final order doctrine for purposes of appealing the district court's denial of absolute and qualified immunity. Tarter, Carroll, and Clark filed also filed interlocutory appeals for the same purpose on July 7, 2004. Upon request by Plaintiff, the district court issued a Final Judgment Order on October 8, 2004 and certified for appeal under Rule 54(b) the federal claims on which the district court had issued summary judgment for Defendants. Accordingly, Plaintiff filed his Notice of Appeal on October 21, 2004.

Defendants Katz, Tarter, Carroll, and Clark argue that the district court should have found their actions shielded by absolute or qualified immunity.

Plaintiff alleged in his notice of appeal that the district court improperly dismissed his supervisory liability claims against Ammon, Kessinger, Pierce, Sherrard, and Thomas; his suit against the City; his malicious prosecution claims against Katz, Carroll, and Clark; his *Brady* claims against Carroll and Clark; his conspiracy claims against Tarter, Carroll, and Clark; and his failure to investigate claim against Tarter. Plaintiff does not argue in briefs to this Court, however, his *Brady* claims against Carroll and Clark, his conspiracy claims, nor his failure to investigate claim against Tarter. Additionally, Plaintiff does not argue in briefs to this Court that the district court erred in granting summary judgment to supervisory Defendants Pierce and Sherrard. Issues not argued on appeal are deemed waived for appellate review. *See Kocsis v. Multi-Care Mgt., Inc.*, 97 F.3d 876, 881 (6th Cir. 1996). We therefore address the remaining claims in this opinion.

## II

## DISCUSSION

### A.     ABSOLUTE IMMUNITY

Whether absolute immunity protects a defendant from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews *de novo*. *Spurlock v. Satterfield*, 167 F.3d 995, 1000 (6th. Cir. 1999).

### 1.          *Absolute Immunity Does Not Extend to Pretrial Acts*

Plaintiff alleges that Defendants Carroll and Clark fabricated notes stating that they did not tell Plaintiff what was stolen from Mrs. V's apartment. Rather, Plaintiff alleges that Clark and Carroll told him what had been stolen. Similarly, Plaintiff alleges that Defendant Katz fabricated evidence when she construed and documented Plaintiff's hairs as a "match" to those found at the crime scene. Carroll, Clark, and Katz do not dispute that, if true, Plaintiff's allegations show a violation of Plaintiff's constitutional rights. It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury. *Stemmler v. Florence*, 126 F.3d 856, 872 (6th Cir. 1997). Instead, Carroll, Clark, and Katz argue that their pretrial acts are inextricably linked to their testimony at trial and therefore cannot be the basis of liability under the doctrine of absolute immunity. While Plaintiff agrees that Defendants' trial testimony cannot serve as the basis for his suit, Plaintiff argues that Defendants' trial testimony does not "relate back" to immunize pretrial acts which of themselves do not merit absolute immunity.

Title 42, Section 1983 of the United States Code creates civil liability for public officials who violate a person's constitutional rights while acting under color of law.[2] The Supreme Court, however, has recognized two kinds of immunity which shield some official actions from liability which might otherwise arise under § 1983. The most common type of immunity is qualified immunity, which protects officials from liability when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). Defendants' assertions of qualified immunity are the subject of Part II.B of this opinion, *infra*. More limited in application, but certainly broader in protection, is absolute immunity, which the Supreme Court has held applies to the performance of certain functions when those functions are integral to the functioning of our adversarial judicial system. *See Briscoe v. LaHue*, 460 U.S. 325, 345 (1983). The Supreme Court has carefully circumscribed the doctrine, however, because absolute immunity protects an official from liability even when the official acted with knowledge of the constitutional violation. *Id.* Testimony at adversarial judicial proceedings is the most historically grounded of these functions which merit absolute immunity. *See id.*

In circumscribing the doctrine, the Supreme Court has advanced the interest served by absolute immunity – the furtherance of our adversarial legal system – by employing a functional test: "The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley v. Fitzsimmons*, 513 U.S. 259, 269 (1995). Those functions more "intimately associated with the judicial phase of the criminal process" are more likely to merit careful consideration for absolute immunity. *Id.* In contrast, those functions more "investigative" in nature – searching for "clues and corroboration" – are more removed from the judicial process and merit only qualified immunity. *Id.* at 273. The Supreme Court's decision in *Buckley v. Fitzsimmons* refused to extend absolute immunity to prosecutors accused of fabricating expert evidence when the prosecutors were acting in an investigatory fashion rather than as advocates. *Id.* at 275.

---

[2] 42 U.S.C. § 1983 reads:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Following the Supreme Court's direction, this Circuit therefore looks to the "nature of the function performed" in evaluating whether to extend absolute immunity. *See id. at* 269. This Circuit, like most of our sister circuit courts of appeals, has held that absolute testimonial immunity does not "relate backwards" to "protect [a defendant] for any activities he allegedly engaged in prior to taking the witness stand for his [] testimony." *Mastroianni v. Bowers*, 160 F.3d 671, 677 (11th Cir. 1998) (denying defendant's motions for summary judgment based on absolute and qualified immunity); *accord Spurlock*, 167 F.3d at 1001. Subsequent testimony can not insulate previous fabrications of evidence merely because the testimony relies on that fabricated evidence. *Id.* This Court has never endorsed such a self-serving result. Merely because a state actor compounds a constitutional wrong with another wrong which benefits from immunity is no reason to insulate the first constitutional wrong from actions for redress.

This Court has consistently held that nontestimonial, pretrial acts do not benefit from absolute immunity, despite any connection these acts might have to later testimony. As early as 1987 this Court noted in *Alioto v. City of Shively* that the doctrine of absolute immunity would not protect an official accused of falsifying evidence or even conspiring to falsify evidence. 835 F.2d 1173, 1174 (6th Cir. 1987). More than a decade after the *Alioto* case, the *Spurlock* panel found that efforts to persuade a third-party witness to lie were non-testimonial acts, regardless of the acts' connection to the third-party witness' later testimony. 167 F.3d at 1002. The *Spurlock* case is particularly instructive, both because it establishes the law in this Circuit on the extent of absolute immunity, and because the facts alleged in the instant case and the facts alleged by the *Spurlock* plaintiffs are strikingly similar.

The *Spurlock* plaintiffs had brought a § 1983 action against defendant police officers and prosecutors after the plaintiffs' wrongful conviction of first degree murder.[3] According to the plaintiffs' complaint, the defendants procured false testimony and manufactured other evidence against plaintiffs. *Id.* at 1002. After a grand jury indicted plaintiffs in part on the basis of this false evidence, plaintiffs were tried and convicted of first degree murder, again on the basis, in part, of this falsified evidence. *Id.* at 999-1000. After plaintiffs were subsequently exonerated for the crime, they pursued the § 1983 action.

This Court heard the *Spurlock* case as an interlocutory appeal from a denial of absolute and qualified immunity for one of the defendant police officers. *Id.* at 997. Like Defendants in the instant case, the *Spurlock* defendant argued that his actions to procure the false testimony of a later trial witness merited absolute immunity because they were inextricably linked to that later testimony and the defendant's own testimony at trial. This Court rejected that argument, noting that "[t]he simple fact that acts may ultimately lead to witness testimony does not serve to cloak these actions with absolute testimonial immunity." *Id.* at 1001. This Court further found that "by virtue of being a witness, [the defendant] is not entitled to absolute immunity in performing any nontestimonial or pre/post-trial acts. What plaintiffs, in essence, allege here is the fabrication of probable cause, and contrary to [the defendant's] arguments, the fabrication of probable cause cannot be immunized by later providing false testimony." *Id.* at 1004.

This Circuit has since ruled consistently with the holding in *Spurlock*. This Court later found in *Hinchman v. Moore* that a municipal officer's verbal fabrications as told to a state trooper and to prosecutors were not entitled to absolute immunity, despite the officer's consistent testimony with these fabrications at the plaintiff's later criminal proceedings. *See Hinchman v. Moore*, 312 F.3d 198, 205 (6th Cir. 2002). We find Defendants' arguments indistinguishable from those put forth by the unsuccessful defendant in *Spurlock*. *See* Part II.A.2, *infra*.

---

[3] The plaintiffs had alleged various violations of constitutional rights, including the First, Fourth, Sixth, and Fourteenth Amendments.

## 2.          *Katz's Pretrial, Nontestimonial Acts*

"Expert" forensic examiners act in an investigatory fashion when they interpret and document physical evidence.  Under the Supreme Court's functional test, the pre-trial investigatory acts by forensic examiners merit no more protection under absolute immunity than do other persons performing investigatory actions.  This Court sees no reason to treat the intentional fabrication of a forensic report differently from the intentional fabrication of a police officer or prosecutor.  The Ninth Circuit has noted that absolute immunity "does not shield non-testimonial conduct . . . . [P]olice officers . . . obviously enjoy no immunity for non-testimonial acts such as fabricating evidence."  *Paine v. City of Lompoc*, 265 F.3d 975, 981 (9th Cir. 2001) (internal quotations and citations omitted).  More specifically, the Fifth Circuit has declined to extend absolute immunity to a forensic examiner who allegedly falsified a forensic report.  *See Keko v. Hingle*, 318 F.3d 639, 644 (5th Cir. 2003).   In a case with facts very similar to the case at bar, the Tenth Circuit held that an action could proceed against a forensic hair examiner accused of falsifying her investigative report and recording a "match" when one did not exist.  *See Pierce v. Gilchrist*, 359 F.3d 1279, 1300 (10th Cir. 2004) (upholding district court's denial of qualified immunity to the forensic examiner on a motion to dismiss).[4]

Katz argues that this Court should hold *Spurlock* inapplicable to actions by expert witnesses who become involved in a case after probable cause is established.  Rather, Katz would have this Court apply the Seventh Circuit test, which Katz contends provides absolute immunity for pre-trial preparatory activities by experts.  *See Buckley v. Fitzsimmons*, 919 F.2d 1230 (7th Cir. 1990), *overruled on other grounds by* 513 U.S. at 269.  Katz also argues that her actions did not create probable cause for Plaintiff's arrest and therefore should benefit from absolute immunity.

We find Katz's arguments in conflict with the precedent of this Circuit.  This panel is bound by the rule of law set forth in *Spurlock*, as a published opinion of this Court.  *See* 6th Cir. Local R. 6.  *Spurlock* clearly held that the fabrication of evidence is a pretrial, nontestimonial act which does not merit absolute immunity.  167 F.3d at 1002.  Moreover, this Court finds that Katz's proposed use of probable cause as some sort of demarcation line is inconsistent with the rationale for absolute immunity and the Supreme Court's direction in *Buckley*.  *See Buckley*, 513 U.S. at 269.  The *Buckley* Court dismissed the argument that probable cause was a dividing line for potential liability attendant to prosecutors' actions.  The *Buckley* Court noted that its approach

> focuses on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful.  The location of the injury may be relevant to the question whether a complaint has adequately stated a cause of action for damages . . . . It is irrelevant, however, to the question whether the conduct of a prosecutor is protected by absolute immunity.

*Id.* at 271-72.  The Supreme Court went on to note that "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterward."  *Id.* at 274.  After judges themselves, prosecutors have historically enjoyed the broadest range of absolute immunity for their actions in the course of criminal prosecutions – broader indeed than that granted police officers or testifying witnesses.  It would be incongruous for this Court to grant a forensic examiner greater protection for her investigatory acts than the Supreme Court has seen fit to grant to prosecutors for the same.

Finally, we note that Katz's report exists independently of her subsequent testimony.  The report is a piece of documentary evidence upon which Plaintiff argues that the prosecutors justifiably

---

[4]The *Pierce* defendant did not assert absolute immunity.

relied to continue their prosecution of Plaintiff. Moreover, as a significant component of the documentary record before both the prosecution and the defense, Katz's report affected the course of the criminal proceedings independent of her testimony to its contents. Accordingly, this Court affirms the district court's refusal to grant Katz absolute immunity on Plaintiff's fabrication of evidence claim.

### 3.          *Carroll's and Clark's Pretrial, Nontestimonial Acts*

Carroll and Clark argue that the creation of their investigatory notes should be protected by absolute immunity because Carroll and Clark testified consistently with the notes at Plaintiff's trial. Plaintiff responds that Carroll and Clark's investigatory notes – which record that neither officer told Plaintiff what had been stolen from the apartment – were the result of pretrial fabrication efforts by Carroll and Clark. These acts of fabrication would be pretrial, non-testimonial acts for which the officers are not entitled to absolute immunity. Like Katz's report, these notes comprise part of the documentary record before the prosecution and defense and affected the course of the criminal proceedings independent of any testimony to the notes' contents. The absence of contemporaneous evidence documenting the officer's observations at the time would have been significant for cross-examination, for example. The notes could have affected the prosecution's willingness to continue toward trial. Their very existence, even if not introduced as evidence at trial, affected Plaintiff's criminal prosecution independent of the officers' testimony.

Like Katz, Carroll and Clark argue that their notes did not establish probable cause against Plaintiff and that this case is therefore distinguishable from *Spurlock*. Carroll and Clark misinterpret both *Spurlock* and the Supreme Court's *Buckley* decision. When Clark and Carroll created their investigative notes, they were acting in an investigative fashion. Whether the two officers created the notes before or after probable cause was established for Plaintiff's arrest is irrelevant for the question of absolute immunity. *Buckley*, 513 U.S. at 274 (refusing to grant absolute immunity to prosecutor for investigative actions taken after probable cause was established). The creation of the notes was a pretrial, nontestimonial act which does not merit absolute immunity. *See id.* at 273.

Carroll and Clark further argue that the gravamen of Plaintiff's complaint is that Clark and Carroll conspired to testify falsely. Yet Plaintiff had separate counts for conspiracy and fabrication of evidence before the court below, and at issue on this appeal, as stated in Plaintiff's brief, is whether Clark and Carroll merit absolute immunity for "falsely documenting and misrepresenting to the prosecutors before trial that they did not tell [Plaintiff] non-public information about the crime only the perpetrator could know." (Pl. Final Second Br. 32.) Plaintiff alleges and puts forth evidence that the investigative notes are false. Carroll and Clark are not entitled to absolute immunity for these pre-trial acts; accordingly, this Court affirms the district court's refusal to grant Carroll and Clark absolute immunity on Plaintiff's fabrication of evidence claims.

### 4.          *Summary*

The Supreme Court demands a functional test for the extension of absolute immunity for government actors. This Circuit has consistently held that absolute immunity for testimony at trial does not "relate back" to shield pretrial, nontestimonial acts such as fabrication of evidence. Accordingly, we affirm the district court's amended order and find that Defendants Katz, Carroll, and Clark are not entitled to absolute immunity on Plaintiff's fabrication of evidence claims.

## B.          QUALIFIED IMMUNITY

We review a district court's denial of qualified immunity *de novo. See Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999). At the outset, however, we must consider the scope of our jurisdiction over Defendants' interlocutory appeals.

### 1.          *Qualified Immunity Appeals as Interlocutory Appeals*

The appeal of a denial of qualified immunity is an interlocutory appeal that this Court hears as a final decision of the district court under 28 U.S.C. § 1291 pursuant to the "collateral order" doctrine. *See Mitchell v. Forsyth*, 472 U.S. 511, 525-27 (1985). If the appeal fails the requirements of the collateral order doctrine, this Court lacks jurisdiction to entertain the appeal. Most denials of summary judgment are nonfinal orders which cannot be appealed under 28 U.S.C. § 1291. *Id.* Only to the extent that a summary judgment order denies qualified immunity based on a pure issue of law may this Court entertain an interlocutory appeal. "A defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (citations omitted).

The Supreme Court has clearly held that a district court's determination that there exists a triable issue of fact *cannot* be appealed on an interlocutory basis, even when that finding arises in the context of an assertion of qualified immunity. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995) ("[A] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial.") The Supreme Court therefore held that 28 U.S.C. § 1291 could not serve as the basis for appellate jurisdiction for appeals from qualified immunity denials to the extent that those appeals took issue with the district court's determination that there existed a genuine issue of fact for trial. *Johnson*, 515 U.S. at 313.[5] To the extent that an appellant on an interlocutory appeal argues issues of fact and law on appeal, this Court will only entertain pure issues of law. To be clear, an appellant's contention that the district court erred in finding a genuine issue of fact for trial is *not* the type of legal question which we may entertain on an interlocutory basis. *Id.* To do so would interject appellate review into a district court's determination that the evidence is sufficient for trial, a nonfinal adjudication for purposes of 28 U.S.C. § 1291 that is indistinguishable from all other, nonappealable, denials of summary judgment.

### 2.          *Claims of Wrongful Arrest and* **Brady** *Violations Against Tarter*

Tarter appeals, in part, the district court's denial of qualified immunity with reference to Plaintiff's allegations of wrongful arrest and *Brady* violations.

With respect to the wrongful arrest, Tarter's sole issue with the district court goes to the district court's determination that a reasonable jury might conclude that Tarter lacked probable cause to arrest Plaintiff following Ms. S's identification. The district court held that the jury might find that Tarter had "several reasons for believing Ms. S was mistaken [in her identification]" and that he therefore lacked probable cause to arrest Plaintiff. (J.A. at 205.)[6] In a § 1983 action, the existence

---

[5]The Supreme Court reasoned that the collateral order doctrine required the issue on interlocutory appeal be sufficiently "separate" from the merits of the underlying litigation. *Johnson*, 515 U.S. at 311. The Supreme Court noted that when the issue on qualified immunity turned on whether the facts, as alleged, constituted a violation of clearly established constitutional law, the issue on appeal was sufficiently separate from the underlying issue of whether the defendant actually undertook the alleged acts, thereby satisfying the collateral order doctrine. *Id.* at 314. In contrast, the Supreme Court reasoned, when "a defendant simply wants to appeal a district court's determination that the evidence is sufficient to permit a particular finding of fact after trial, it will often prove difficult to find any such 'separate' question – one that is significantly different from the fact-related legal issues that likely underlie the plaintiff's claim on the merits." *Id.*

[6]Ms. S's initial physical description of her assailant was inconsistent with Plaintiff, especially the fact that Ms. S reported her attacker as "clean shaven" and Plaintiff had, in fact, worn a beard continuously for the last 10 years. There were also discrepancies in height, eye color, and hair length. Additionally, the identification was made pursuant to a one-on-one show-up and Ms. S had failed to pick Plaintiff out of a photopak. "An officer contemplating arrest is

of probable cause is a question of fact. *See United States v. Gaudin*, 515 U.S. 506, 521 (1995). Tarter does not dispute the legal theory of Plaintiff's claim – that without probable cause, the arrest would have violated Plaintiff's clearly established constitutional rights. Because Tarter's argument goes to "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial" this Court lacks jurisdiction to entertain Tarter's appeal of the district court's denial of qualified immunity on Plaintiff's wrongful arrest claim. *Johnson*, 515 U.S. at 313.

The district court also denied Tarter qualified immunity on Plaintiff's allegation that Tarter withheld exculpatory evidence – the existence of the fourth rape – in violation of *Brady v. Maryland*, 373 U.S. 83 (1963*)*. Again, Tarter's sole argument with the district court's denial of qualified immunity goes to whether there exists a genuine issue of fact for trial. Tarter argues that Plaintiff failed to establish that Tarter was aware of the fourth rape or that the fourth rape was, in fact, exculpatory. (Defs. Final Brief 50.)

Both of these arguments take issue with the district court's determination that there exists a genuine issue of fact for trial. Exculpatory evidence is evidence which is material to either guilt or punishment, *Brady*, 373 U.S. at 87, and materiality under *Brady* is a mixed question of law and fact for the jury, *see United States v. Phillip*, 948 F.2d 241, 250 (6th Cir. 1991). The district court held that there exists a genuine issue of fact with respect to the materiality of the fourth rape. Moreover, whether Tarter was aware of the rape is an underlying issue of fact inherent in the district court's decision.[7] Accordingly, this Court lacks jurisdiction to entertain Tarter's appeal from the district court's denial of qualified immunity for Plaintiff's claim of *Brady* violations. *Johnson*, 515 U.S. at 313.

### 3.    *Claims of **Brady** Violations and Fabrication of Evidence Against Katz*

Katz appeals the district court's denial of qualified immunity with reference to Plaintiff's allegations of *Brady* violations and fabrication of evidence.

Plaintiff alleges that Katz knowingly withheld the existence of two "non-matching" head hairs from the recovered pantyhose, or in the alternative, that she withheld knowledge that none of the hairs "matched." Plaintiff presents evidence that 7 "negroid" hairs were recovered from the pantyhose, while Katz's forensic report showed only 5 hairs, all of which Katz "matched" with Plaintiff. This presents sufficient evidence such that a reasonable jury could conclude that Plaintiff's allegations are correct. The district court agreed. (*See* J.A. at 208 ("[T]here is a question of whether Defendant Katz's failure to disclose one or two dissimilar head hairs is material. Therefore, this is a question for the jury.").) If Plaintiff's allegations are correct, then Katz deliberately withheld the existence of those two nonmatching hairs. Katz "cannot seriously contend that a reasonable [investigator] would not know that such actions were inappropriate and performed in violation of an individual's constitutional . . . rights." *Spurlock*, 167 F.3d at 1005. Yet Katz's sole argument for qualified immunity to this Court is that her "failure to disclose," if any, amounts only to negligence. Katz's culpability is an issue of fact for a jury. We cannot entertain Katz's arguments going to disputed issues of material fact on this interlocutory appeal. *Johnson*, 515 U.S. at 313.

---

not free to disregard exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Kuehl v. Burris*, 173 F.3d 646, 650 (8th Cir. 1999). An officer cannot "ignore substantial exculpatory evidence" in determining probable cause. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 305-06 (6th Cir. 2005).

[7]Plaintiff presents evidence that Tarter was the second officer assigned to investigate the fourth rape. The lead investigator for that fourth rape also testified that he shared information about the crime over the course of the investigation regularly with Tarter.

We similarly cannot entertain Katz's arguments for qualified immunity against Plaintiff's fabrication of evidence claim. Katz argues in the first instance that the district court was wrong to deny her absolute immunity on Plaintiff's fabrication of evidence claim, *see supra*, but in the alternative, Katz argues that she merits at least qualified immunity against this allegation. The district court did not address the application of qualified immunity to Plaintiff's fabrication of evidence claim against Katz. A review of the record shows that the parties dispute what the evidence shows. Plaintiff's expert reports that Katz's findings are far afield of what any reasonable forensic examiner would find from the evidence; this is sufficient evidence from which a jury might reasonably infer that Katz fabricated her report. The thrust of Katz's argument to this Court, however, is that Plaintiff's evidence at most establishes only a negligent performance of her duties.[8] By arguing that the evidence establishes at most a negligent performance of her duties, Katz is arguing disputed issues of fact to this Court. We cannot entertain Katz's arguments going to disputed issues of material fact on this interlocutory appeal. *Johnson*, 515 U.S. at 313.[9]

### 4.        *Claim of Suggestive Show-up Against Tarter*

The district court denied qualified immunity to Tarter in response to Plaintiff's allegations that Tarter used an unduly suggestive show-up procedure in getting Ms. S to identify Plaintiff. With respect to this claim, Tarter puts forth several legal arguments in this appeal. First, Tarter argues that there was no well established constitutional right in 1992 to be free of "show-ups." Second, Tarter argues that Plaintiff waived his right to contest the show-up, and therefore no due process violation could have occurred. Finally, Tarter argues that, as a matter of law, any due process violation that did occur was a result of the prosecutor's choice to use the show-up identification at trial, and not the direct result of Tarter's use of the show-up in the first instance. (*See* Defs. First Final Br. 36.) We address Tarter's arguments in turn.

This Court follows a two step inquiry in reviewing a claim for qualified immunity. First, we consider "(1) whether the plaintiff has asserted a violation of a known [] constitutional right; and (2) whether the constitutional right was so clearly established at the time in question that a reasonable official in the defendant's position would have known that he was violating the plaintiff's constitutional rights." *Hutsell v. Sayre*, 5 F.3d 996, 1003 (6th Cir. 1993) (citing *Siegert v. Gilley*, 500 U.S. 226, 231 (1991)).

---

[8]Under law that was clearly established in 1992, Katz would have violated Plaintiff's constitutional rights if she "knowingly fabricated evidence against [him], and if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989). Plaintiff alleges that Katz knowingly fabricated her laboratory report and presents evidence in the form of expert testimony. Plaintiff's expert opines that Katz's conclusions that Plaintiff's hair "matched" the hair found at the first crime scene are far afield of what a reasonable forensic examiner would conclude; a reasonable jury could conclude in turn that Katz intentionally fabricated her report. Katz rebuts that her laboratory reports represent at most a negligent performance of her duties, and that an expert witness may not opine that someone else "fabricated" evidence and cites to a district court opinion in support, *United States v. Reicherter*, 318 F. Supp. 2d 265, 268 (E.D. Pa 2004).

[9]Katz also takes issue with Plaintiff's expert opinion. Katz argues that Plaintiff's expert improperly opined that Katz's report was a fabrication and cites a district court opinion for her authority. *See Reicherter*, 318 F. Supp. 2d at 268. Even were this Court to credit an out-of-circuit district court opinion as persuasive authority, Katz misinterprets the *Reicherter* holding. The *Reicherter* court held that a periodontal expert witness could not offer legally conclusive testimony that the bills of the defendant dentists were "fraudulent." *Id.* The court did allow the periodontist to testify to whether or not the dentists actually performed the procedures they claimed on their bills. *Id.* Similarly, Plaintiff offers expert opinion that the evidence presented to Katz for analysis does not and could not support the conclusions that Katz reached. Plaintiff's expert provides proper testimony as to what a reasonable forensic examiner would do with hair examinations and an expert assessment of the evidence presented to Katz. Plaintiff's expert does not address the legal conclusion of "fabrication," which is properly left to the courts to decide.

Plaintiff certainly alleges the violation of a known constitutional right. Plaintiff argues that Tarter's use of the show-up violated Plaintiff's right to be free of unduly suggestive identification procedures. Criminal suspects have a constitutional right to be free from identification procedures "so unnecessarily suggestive and conducive to irreparable mistaken identification" that the identification's use violates due process of law. *Stovall v. Denno*, 388 U.S. 293, 302 (1967). If an impermissibly suggestive identification leads to a criminal conviction, the Supreme Court has held on a number of occasions that the defendant's conviction must be overturned. *See, e.g.*, *id.*

Tarter argues that a reasonable officer would not have known that his use of the show-up was a violation of Plaintiff's constitutional rights, because show-ups are not *per se* unconstitutional. Yet the Supreme Court has held that police officers must evaluate the totality of the circumstances and reach a reasoned conclusion as to whether an identification procedure is impermissibly suggestive or not. *See Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). The Supreme Court has never said that law enforcement may do away with this consideration merely because a criminal suspect consents to come in for an identification procedure. On the contrary, the Supreme Court and this Court require an assessment of the circumstances *before* the decision to undertake a show-up. *Id.* This Court has never held that a police officer is free to ignore the constitutional restraints on police action merely because the constitution does not forbid such action *in all circumstances*. Tarter may as well argue that a police officer is free to make warrantless searches and seizures without fear of constitutional liability because the Constitution does not prohibit such searches in all cases.

This Court has entertained allegations of suggestive identification procedures as viable constitutional tort claims. *See, e.g.*, *Hutsell*, 5 F.3d 1005. To the extent that Tarter's decision to proceed with the line-up was a reasonable one in light of the infirmities of the situation, the decision is one for the finder of fact. An appeal of a denial of qualified immunity authorizes us only to address the issues of pure law. *Johnson*, 515 U.S. at 313.

Tarter also argues that Plaintiff waived his right to contest the show-up. The district court found a genuine issue of material fact going to whether Plaintiff's waiver was "knowing[], intelligent[], or voluntary[]." (J.A. at 203.) "A defendant may not appeal a district court's order denying a claim of qualified immunity 'insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial.'" *Sheets*, 287 F.3d at 585 (quoting *Johnson*, 515 U.S. at 320). We may not entertain Tarter's arguments which contest the district court's findings of genuine issues of fact for trial. *Johnson*, 515 U.S. at 313.

To the extent that Tarter is arguing that Plaintiff's consent to the show-up by signing the preprinted "waiver" form precludes any legal right to bring a due process claim, we find that Tarter misunderstands the law of constitutional waiver. Plaintiff does not have a right to a line-up versus a show-up. Plaintiff has a due process right which includes the right to be free from unduly suggestive and unreliable identification procedures. *Stovall*, 388 U.S. at 302. By consenting to a show-up in lieu of a line-up Plaintiff was not waiving this right, but merely agreeing to be put forth in front of a witness before his indictment, when Plaintiff had a right not to appear for an identification procedure at all. Plaintiff does not contest that had the show-up not been unduly suggestive, the identification would have been properly in evidence. Rather, Plaintiff argues that as a result of circumstances unknown to him at the time, the show-up was unduly suggestive. Plaintiff did not "waive" any improper suggestiveness associated with the show-up by agreeing to appear. The preprinted waiver form does not include any language going to Plaintiff's right to due process or a fair trial. Criminal suspects may agree, for example, to appear for a line-up prior to any indictment or even arrest. Such agreement does not mean, however, that the suspects lose their right to contest any suggestiveness in the line-up not caused by them.

Finally, we come to Tarter's final argument. Tarter argues that it was the action of the prosecutor, in using the impermissibly suggestive identification at trial, which led to Plaintiff's injury,

and not Tarter's procurement of the identification itself. It is true that an unduly suggestive identification does not, in and of itself, violate constitutional rights. *See Manson v. Brathwaite*, 432 U.S. 98, 113 (1977). It is also true that the prosecution's use of the identification at trial is a necessary intervening act for injury to occur and liability for any party to attach. *Id.* It is not true, however, that the prosecutor's discretion to control the state's case at trial is such an intervening act to excuse Tarter from the "natural consequences" of his actions and therefore any tort liability. In constitutional-tort cases, "a man [is] responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187 (1961). This principle led the Supreme Court in *Malley v. Briggs* to hold that the issuance of an arrest warrant will not shield the police officer who applied for the warrant from liability for false arrest if "a reasonably well-trained officer in [his] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." 475 U.S. 335, 345 (1986) (footnote omitted). The Supreme Court's reasoning is directly applicable here. The prosecutor's decision to use the identification does not shield Tarter from liability if he reasonably should have known that use of the identification would lead to a violation of Plaintiff's right to a fair trial.

Accordingly, we find that the district court correctly denied Tarter qualified immunity for Plaintiff's claim of suggestive identification.

## C.     "MALICIOUS PROSECUTION" AGAINST KATZ

Plaintiff argues that the district court improperly dismissed Plaintiff's "malicious prosecution" claim against Katz. Plaintiff alleges that Katz caused his detention to be unlawfully continued by both fabricating evidence and withholding exculpatory evidence, the absence of either or both of which would have dissolved probable cause for Plaintiff's continued detention. Plaintiff and the district court both style this claim as a claim for "malicious prosecution." We find that Plaintiff states a viable cause of action. We also find, however, that continued use of the "malicious prosecution" label for Plaintiff's cause of action in this instance is somewhat of a misnomer. We take this opportunity to clarify the nature of this particular claim as it stands before this Court, for the benefit of both the case at bar and future litigants.

The substance of Plaintiff's claim against Katz is that his detention was continued without probable cause. Traditionally, the federal courts have grouped continued detention without probable cause with several other potential injuries under the umbrella of a "malicious prosecution" claim, actionable under § 1983 as a violation of due process. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) (reviewing the circuit courts of appeals' treatments of a "malicious prosecution" claim under § 1983). The courts took this approach, in part, because of the wide range of potential injuries a wrongful prosecution could generate, from an unlawful seizure to a misuse of actual court process. The due process clause was more amenable to such variation. Accordingly, the circuit courts of appeals, including the Sixth Circuit, looked to the common law tort of malicious prosecution for help in defining the claim.

This traditional approach, however, is no longer valid in light of the Supreme Court's 1994 decision in *Albright v. Oliver*. The *Albright* plaintiff alleged what was traditionally labeled a "malicious prosecution" claim: a violation of his liberty interest in being "free from prosecution without probable cause" under the substantive due process clause of the Fourteenth Amendment when the defendants brought criminal charges against the plaintiff for selling a cocaine "look-alike" substance; a court later dismissed the case for failure to state an offense under Illinois law. *Id.* at 268-69. The *Albright* plurality found that the substance of the plaintiff's claim amounted to pretrial deprivations of liberty, and that the plaintiff was therefore actually alleging a Fourth Amendment – and not Fourteenth Amendment – violation. *Id.* at 274-75 (plurality opinion) (Rhenquist, C.J.). Because the *Albright* plaintiff had not petitioned for *certiorari* under the Fourth Amendment, the Supreme Court declined to address any Fourth Amendment claim. *Id.* at 275.

In their concurrences, Justices Ginsberg and Souter clearly articulated their understanding that Fourth Amendment protections extended beyond an initial seizure. *See id.* at 277-78 (Ginsburg, J., concurring); *id.* at 289-90 (Souter, J., concurring). Justice Ginsberg noted that "[a]t common law, an arrested person's seizure was deemed to continue even after release from initial custody." *Id.* at 277-78. Justice Ginsberg reasoned that a person continued to be seized for Fourth Amendment purposes when their freedom of action was restrained due to the pending criminal proceedings (e.g., restrictions on travel, requirements to appear). *Id.* at 278. Justice Ginsberg also explicitly recognized that police officers may violate the Fourth Amendment by perpetuating an unlawful seizure when it is in their power to dissolve probable cause. *Id.* at 280. Justice Souter noted that many forms of damages and injury occur between an initial arrest and a criminal trial itself, recovery for which requires recognition of the Fourth Amendment's continuing protection. *Id.* at 290-91.

This Court has interpreted *Albright* as requiring that traditional claims for "malicious prosecution" be pursued and treated as Fourth Amendment violations when the gravamen of the complaint is continued detention without probable cause. *See Spurlock*, 167 F.3d at 1004-06.[10] Accordingly, Fourth Amendment jurisprudence directs the disposition of such claims. *Id.* We have also affirmatively recognized the viability of such Fourth Amendment-based claims under § 1983. The *Spurlock* panel was presented with the question of whether the defendant there was entitled to qualified immunity for his pretrial acts of evidence fabrication and witness coercion. *Id.* at 1005. The plaintiffs' amended complaint alleged, in part, violations of the plaintiffs' Fourth Amendment rights, and this Court found that "plaintiffs sufficiently raise claims that allege violations of their constitutional and/or statutory rights. Namely, that . . . [plaintiffs] were held in custody despite lack of probable cause to do so." *Id.* While this Court referred to the *Spurlock* plaintiffs' claim as one for "malicious prosecution," it is clear from the facts of the case that the gravamen of the plaintiffs' complaints was their continued, unlawful detention. *Id.* at 1006-07 (noting that "a reasonable police officer would be on notice that [] detaining a suspect, despite the fact that the evidence used to detain the individual was fabricated, would [] be unlawful . . . .") ("The injuries alleged here occurred . . . at the very point at which [plaintiffs] continued to be detained, despite the lack of probable cause for such detention."). *Spurlock* therefore held that continued detention without probable cause is an actionable Fourth Amendment injury under § 1983. *Accord Pierce*, 359 F.3d at 1292-93 (10th Cir.); *Gallo v. City of Philadelphia*, 161 F.3d 217, 225 (3d Cir. 1998); *Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997).[11]

---

[10]In the aftermath of *Albright*, this Court has not yet been faced with a § 1983 claim for an injury formerly treated under the "malicious prosecution" umbrella which does not allege, at heart, a Fourth Amendment injury. We do not decide today whether some claims formerly brought under the "malicious prosecution" umbrella might allege an injury distinct from Fourth Amendment protections – that is, an injury distinct from the type alleged in *Albright* – and survive as a due process violation in the post-*Albright* world. For a discussion of such potential claims, see John T. Ryan, Note, *Malicious Prosecution Claims Under Section 1983: Do Citizens Have Federal Recourse?*, 64 Geo. Wash. L. Rev. 776 (1996).

We acknowledge that some of our sister circuit courts of appeals have addressed the parameters of a "malicious prosecution" claim since *Albright*. Until presented with factual circumstances meriting an analysis beyond the Fourth Amendment, however, we decline to reach the question about whether a non-Fourth Amendment "malicious prosecution" cause of action survives under § 1983 after *Albright*. We would also note that what our sister courts of appeals are calling a § 1983 malicious prosecution claim varies by circuit. *Compare Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (requiring § 1983 malicious prosecution claims to be premised on a Fourth Amendment violation), *with Pierce*, 359 F.3d at 1294-97 (10th Cir.) (addressing a § 1983 "malicious prosecution" claim as implicating both the Fourth Amendment and due process). *See generally Castellano v. Fragozo*, 352 F.3d 939, 949 (5th Cir. 2003) (surveying the circuits for treatment of § 1983 "malicious prosecution" claims after *Albright*).

[11]The dissent argues that *Spurlock* does not compel the result we reach here because the official capable of dissolving probable cause in *Spurlock* was a police officer and here the official is a state-employed forensic examiner. We find the distinction immaterial. Katz, as an expert forensic examiner in the employ of the state police, arguably has just as much, if not more in certain cases, influence over the existence of probable cause as a municipal police officer. Moreover, the dissent correctly notes that "[i]n the end, we do not know what effect Katz's analysis would have had upon

While *Spurlock* restyled the cause of action for continued detention without probable cause in this Circuit, it did not establish a new constitutional right. Rather, *Spurlock* was responding to *Albright's* direction to change the legal analysis which courts apply to claims alleging a violation of the right. An investigative official had a duty both before and after *Albright* to refrain from engaging in acts which continued a person's detention without probable cause. We held as much in *Spurlock* against the defendant's argument that the change in legal analysis somehow altered the defendant's duties. 167 F.3d at 1006. The *Spurlock* panel held that the right to be free of continued detention without probable cause was clearly established well before the 1993 events in question in the case at bar. *Id.* at 1006-07.

Finally, it is clear from *Albright* that we cannot continue to style all injuries formerly encompassed by the "malicious prosecution" basket as due process violations. Rather, we must "unpack" this basket to understand the underlying constitutional violation. A plaintiff must pursue relief under the appropriate constitutional guarantee, and the Court must apply the appropriate legal standard. A reading of *Albright* and *Spurlock* also makes clear that the subset of malicious prosecution claims which allege continued detention without probable cause must be pursued and analyzed under the Fourth Amendment. Seeking clarity in language, we decline to style Plaintiff's cause of action as an action for "malicious prosecution" under § 1983. Rather, we characterize the cause of action simply as the right under the Fourth Amendment to be free from continued detention without probable cause. Here, Plaintiff properly pled a Fourth Amendment violation in his complaint and pursued as much in the court below. We therefore apply Fourth Amendment analysis.

Plaintiff alleges that had Katz not unlawfully suppressed exculpatory information – that his hair did not match that found in the pantyhose, or alternatively, that there was a least one negroid hair which did not match Plaintiff's – probable cause for Plaintiff's continued detention would have been destroyed. Plaintiff also alleges in the alternative that Katz's fabrication of inculpatory information in the form of a false laboratory report led to Plaintiff's continued detention. Plaintiff presents evidence that Katz knew of and failed to disclose that there was at least one negroid hair that even her analysis did not associate with Plaintiff. Plaintiff also presents evidence from which a jury could infer that Katz knew that none of Plaintiff's hair matched that found in the pantyhose, and thus that had this information been made known, probable cause for Plaintiff's continued detention would have dissolved. Because reasonable minds could differ on the questions of what Katz did and whether Katz's fabrication or failure to disclose would have dissolved probable cause, this is a question for the jury. *See Gaudin*, 515 U.S. at 521.

The district court dismissed Plaintiff's § 1983 claim against Katz premised on Plaintiff's continued detention because the court considered that Plaintiff's claim had its origins in Katz's suppression of exculpatory evidence and therefore was more properly pursued as a *Brady* violation. This Court agrees with the district court that Plaintiff's *Brady* and continued detention claims against Katz share a factual premise. This Court disagrees with the district court, however, that this similarity restricts Plaintiff to one theory of recovery over the other. The legal constructs of plaintiff's continued detention claim, which allege a Fourth Amendment violation, are distinct from a *Brady* claim, which alleges a due process violation. Plaintiff alleges *both* that his detention was unlawfully continued due to Katz's failure to disclose exculpatory evidence (what Plaintiff and the district court term his "malicious prosecution" claim) and that his right to a fair trial was abridged. The *situs* of injury is distinct and therefore Plaintiff should be able to pursue both legal theories. It is not the role of this Court to restrict Plaintiff's choice of viable legal theories. Other courts have allowed plaintiffs to pursue two legal theories under § 1983 premised on the same underlying facts. *See Atkins v. County of Riverside*, No. 03-55844, 2005 U.S. App. LEXIS 19928, at *9-11 (9th Cir.

---

the continuing detention of Gregory." This is exactly our point. It is not our job to find whether or not probable cause would have dissolved had Katz revealed the exculpatory information; this is the precise province of the jury.

Sept. 14, 2005) (unpublished opinion) (permitting plaintiff to pursue, simultaneously, both a fabrication of evidence claim and a *Brady* violation claim).

Because there exists a genuine issue of material fact about whether Katz intentionally withheld exculpatory information in order to continue Plaintiff's detention without probable cause, this Court reverses the district court's grant of summary judgment on this claim.

We briefly address Katz's argument to this Court that Katz is, at minimum, entitled to qualified immunity against Plaintiff's malicious prosecution claim. Katz argues that probable cause for Plaintiff's arrest and detention existed independent of Katz's findings on Plaintiff's hair. We note that whether or not probable cause existed in the absence of the hair evidence, or whether probable cause would have been destroyed by a finding from Katz that the hairs from the crime scene could not have come from Plaintiff, is an issue of fact for the jury. *Id.* This Court cannot entertain an argument going to qualified immunity on an interlocutory appeal when the argument rests on disputed issues of fact. *Johnson,* 515 U.S. at 313.

## D.    SUPERVISORY LIABILITY

Plaintiff argues that the district court improperly dismissed his complaints against supervisory Defendants Thomas, Ammon, and Kessinger. The supervisory Defendants present a three-fold counterargument: 1) the statute of limitations had run by the time Plaintiff amended his complaint to name the supervisors and the amendment does not "relate back" to the timing of the original complaint, 2) Plaintiff has failed to support his claims for supervisory liability, and 3) Defendants are entitled to qualified immunity. Because the district court did not err in disposing of Plaintiff's claim on the merits, we do not reach Defendants' other grounds.

"Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (citing *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (1989)). Rather, the supervisors must have actively engaged in unconstitutional behavior. *Id.* Therefore, liability must lie upon more than a mere right to control employees and cannot rely on simple negligence. *Id.*

Defendant Thomas was the direct supervisor of Defendant Katz. Defendants Ammon and Kessinger were supervisors over Defendants Carroll and Clark. In order for liability to attach to any of these supervisors, Plaintiff must prove that they did more than play a passive role in the alleged violations or show mere tacit approval of the goings on. *Id.* Plaintiff must show that the supervisors somehow encouraged or condoned the actions of their inferiors. *Id.*; *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995). Plaintiff, however, presents evidence only that supervisors Thomas, Ammon, and Kessinger failed to review their subordinates' work. (*See* Pl. Final Second Br. 62-65.)

Plaintiff argues that this Court's decisions in *Leary v. Williams* and *Taylor v. Michigan Department of Corrections* support his contention that supervisors who "knowingly abdicate specific responsibilities to oversee subordinates" can be held liable for their subordinates' unconstitutional acts. (*See* Pl. Final Second Br. 61 (citing *Leary v. Williams*, 349 F.3d 888, 903 (6th Cir. 2003) and *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995).) Under Plaintiff's theory, such complete abdication of supervision "tacitly acquiesced in, and predictably led to" the constitutional violations in issue. (*See* Pl. Final Second Br. 62.) Essentially, we understand Plaintiff to interpret *Leary* and *Taylor* as establishing a "failure to supervise" theory of liability akin to *Monell* liability for "failure to train."

We believe Plaintiff misinterprets this Court's decisions in both *Taylor* and *Leary*. The *Taylor* panel had before it a defendant prison warden whose individual responsibility was to insure all prisoner transfers did not risk inmate safety. *See Taylor*, 69 F.3d at 80. By failing either to

establish a reasonable system to review prisoner files before transfer, or review them himself, the warden approved transfers which directly affected prisoner safety and thereby resulted in violations of prisoner Eighth Amendment rights. *See id.* Similarly, the *Leary* plaintiff, a teacher, had presented evidence that the defendant, a school superintendent, was responsible for approving all teacher transfers after plaintiff alleged that her transfer was in retaliation for her exercise of free speech. The *Leary* defendant had stated that "he was the one who put the transfers 'into operation,'" 349 F.3d at 904, establishing the defendant's active participation in the constitutional violation. In both *Taylor* and *Leary* the plaintiffs presented evidence that it was the *active performance* of the defendants' individual job function which directly resulted in their constitutional injury. Plaintiff presents no evidence that any execution of the supervisors' job function resulted in Plaintiff's injury.

It is clear from the record that Plaintiff has failed to introduce evidence that would make Thomas, Ammon, and Kessinger liable in their role as supervisors of the alleged tortfeasors. We accordingly affirm the district court's dismissal of Plaintiff's supervisory liability claims.

## E.    CITY LIABILITY

### 1.    *City Liability Under § 1983*

The district court granted the City summary judgment on all claims. Because we find that the district court erred when it dismissed Plaintiff's claims against the City, we reverse the district court's summary judgment for Defendant City.

Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior*. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978). A plaintiff may only hold a local government entity liable under § 1983 for the entity's own wrongdoing. *Id.* A local government entity violates § 1983 where its official policy or custom actually serves to deprive an individual of his or her constitutional rights. *Id.* A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers. *Id.* Where the identified policy is itself facially lawful, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (quoting *Harris*, 489 U.S. at 388 (1989)). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." *Id.* at 412; *see also Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997).

Plaintiff alleges: 1) that the City has an unconstitutional custom of using overly suggestive show-up procedures; and 2) that the City failed to train its officers in a) proper identification techniques and b) the requirement to disclose exculpatory material, such that the plainly obvious result is likely violations of well established constitutional rights – the same rights which Plaintiff alleges the individual Defendants violated in his case.

### 2.    *Failure to Train on the Handling of Exculpatory Evidence*

The courts recognize a systematic failure to train police officers adequately as custom or policy which can lead to city liability. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Only when the failure to train amounts to "deliberate indifference" on behalf of the city toward its inhabitants, however, will failure to train lead to city liability under § 1983. *Id.* at 389. The Supreme Court explained this standard in *Harris*:

> The issue . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390 (footnotes omitted).

Plaintiff can survive summary judgment under this standard by showing that officer training failed to address the handling of exculpatory materials and that such a failure has the "highly predictable consequence" of constitutional violations of the sort Plaintiff suffered. *See Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003) (referencing *Harris*, 489 U.S. at 390). In *Cherrington*, this Court held that a city's failure to train its officers on warrantless arrests was so likely to result in constitutional violations that the city's failure amounted to deliberate indifference. 344 F.3d at 646-47. Here, Plaintiff alleges that Tarter and Clark's failures to disclose exculpatory materials were the "'highly predictable consequence[s] of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" (Pl. Final Second Br. 67 (citing *Brown*, 520 U.S. at 409.)) In their investigative capacities, police officers regularly uncover exculpatory materials. The Supreme Court has laid down very specific obligations of police officers on the disclosure of exculpatory materials. *See Brady*, 373 U.S. at 87. Widespread officer ignorance on the proper handling of exculpatory materials would have the "highly predictable consequence" of due process violations. *See Cherrington*, 344 F.3d at 646. Therefore this Court looks to the training City police officers received in handling exculpatory materials.

Plaintiff presents two forms of evidence in support of his failure to train claim: 1) expert testimony that LDP training on handling of exculpatory materials was nonexistent, and 2) deposition and inferential evidence that LDP officers generally did not receive any instruction in the handling of exculpatory materials. Plaintiff's expert reports that the City failed to properly train its officers in the handling of exculpatory materials. Plaintiff has deposition testimony from the Chief of Police that the Chief believed that officers were confused about their *Brady* obligations, but that the Chief could not recall any remedial steps or training having been taken. Plaintiff also presents evidence from current and former LDP Chiefs of Police and LDP officers that training would have been documented, but points out that the City has presented no evidence of any formal training on exculpatory materials.

The City counters that its officers have acknowledged their duty to disclose exculpatory evidence and avers that its officer have testified to training to that effect. The City's references to the Joint Appendix reveal one actual piece of evidence, deposition testimony from the former Chief of Police, which states that officers are trained to document and turn over to the prosecutor all evidence in their possession.

At a minimum, Plaintiff has presented sufficient evidence to survive summary judgment on his failure to train allegations regarding exculpatory materials. The obligation to turn over exculpatory materials is a significant constitutional component of police duties with obvious consequences for criminal defendants. This Court has held that evidence pointing to a City's failure to provide *any* training on key duties with direct impact on the constitutional rights of citizens is sufficient to survive summary judgment with a *Monell* failure to train claim. *See Sell v. City of*

*Columbus*, No. 00-4467, 2002 U.S. App. LEXIS 17955, at \*27 (6th Cir. Aug. 26, 2002) (unpublished opinion) (reversing summary judgment for defendant city when Plaintiff had presented evidence that City failed to train officers in constitutional implications of evicting without a pre-eviction hearing).

This Court finds that the district court erred when it failed to consider that evidence of failure to train on the proper handling of exculpatory materials has the "highly predictable consequence" of constitutional violations. *See Brown*, 520 U.S. at 409. A custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the part of the City and the causal connection to the constitutional violations experienced by Plaintiff. *Id.* at 407. Plaintiff has carried his burden for summary judgment.

The City avers that Plaintiff failed to plead a failure to train regarding *Brady* materials under *Monell* in his complaint and has therefore waived this avenue of recovery. But Plaintiff did claim failure to train under *Monell* for the City's identification procedures and all the objectionable behavior regarding the handling of exculpatory materials was articulated in Plaintiff's complaint. "The liberal notice pleading of Rule 8(a) is the starting point of" this Court's analysis of whether Plaintiff sufficiently put the City on notice of his claim and basis for seeking recovery. *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 514 (2002). Here, Plaintiff's complaint clearly articulated the actions of City officers upon which Plaintiff based his demand for relief, articulating clear allegations related to exculpatory materials. We therefore reverse the district court's grant on summary judgment to the City on Plaintiff's *Monell* liability theory for failure to train on the handling of exculpatory materials.

### 3.        *Custom of Overly Suggestive Show-ups*

Plaintiff also alleges that the City had a custom of using overly suggestive show-ups and that the City failed to train its officers in proper identification techniques. The district court dismissed this claim, finding that Plaintiff had failed to make a showing of other complaints about the City's use of show-ups. In so holding, the district court overlooked both facts in this case and a significant prong of this Court's jurisprudence. First, Plaintiff need not present evidence of a pattern of complaints consistent with his own if he presents evidence of a written policy unconstitutional on its face. *Monell*, 436 U.S. at 692-94. The facts of this case show that the City's written line-up "waiver" form is direct evidence of a custom or practice, obviating the need for circumstantial evidence a court might otherwise seek. *See id.* Second, Plaintiff need not present evidence of other complaints if he can show that the City failed to train its officers in proper identification techniques, and that such failure to train had the "obvious consequences" of leading to constitutional violations of the sort experienced by Plaintiff. *See Cherrington*, 344 F.3d at 646.

One-on-one show-ups are inherently suggestive. *Cf. Stovall v. Denno*, 388 U.S. at 302; *see also Webb v. Havener*, 549 F.2d 1081, 1086-87 (6th Cir. 1977); *Haynes v. Bell*, No. 96-6443, 1998 U.S. App. LEXIS 9377, at \*9-10 (6th Cir. May 6, 1998) (unpublished opinion). Yet the "primary evil" to be avoided with identification procedures is any "substantial likelihood" that an "irreparable misidentification" will take place. *See Neil v. Biggers*, 409 U.S. at 199-200. Therefore the Supreme Court has refused to find show-ups *per se* unconstitutional. Rather, the Supreme Court has directed us to look to the totality of the circumstances to understand whether an identification made during a one-on-one show up is otherwise reliable. *Id.* The Supreme Court has directed us to look to 1) the opportunity of the witness to observe the perpetrator during the crime, 2) the witness' degree of attention, 3) the accuracy of the witness' prior description of the perpetrator, 4) the level of certainty demonstrated by the witness at the identification, and 5) the length of time between the crime and the confrontation. *Id.* We note that the Supreme Court's directions to the courts can also be stated in the inverse: show-ups are never *per se* constitutional.

The Supreme Court's teaching makes it clear that a failure to consider the totality of the circumstances, and the indiscriminate use of one-on-one show-ups, would have the obvious

consequences of constitutional violations.   "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall*, 388 U.S. at 302.  This condemnation exists because show-ups exacerbate weaknesses already existing in eye-witness identification. *See Marshall v. Rose*, 499 F.2d 1163, 1165 (6th Cir. 1974) ("[T]he danger inherent in eyewitness identification has long been a subject of grave concern.")  By presenting only a single suspect to a witness, police convey an implicit message that "this is the guy." *See Foster v. California*, 394 U.S. 440, 442-43 (1969).  In *Foster*, the Supreme Court vacated the petitioner's conviction after finding that an identification which resulted only after the petitioner had been presented to a witness through a line-up, a subsequent one-on-one show-up, and then another line-up, was so suggestive that it "made it all but inevitable that [the witness] would identify petitioner whether or not he was in fact 'the man.'" *Id.*

Neither the Supreme Court nor this Court has ever found a show-up identification made after a witness failed to pick a suspect out of a line-up or photo array to be otherwise reliable and admissible into evidence.  In fact, the jurisprudence from this Circuit and the Supreme Court teaches just the opposite.  In *Foster*, the witness failed to make an identification at an initial line-up, despite a certain level of suggestiveness even in the line-up.  394 U.S. at 443.  It was only after the witness saw the suspect again at a one-on-one show-up, at which the witness made a tentative identification, and finally at another line-up, did the witness make a firm identification. *Id.*  The Supreme Court found the process so suggestive as to deny the suspect due process of law. *Id.*  Likewise, this Circuit has found that a witness' repeated exposure to a suspect prior to identification so taints the identification that a substantial likelihood of misidentification exists. *See Thigpin v. Cory*, 804 F.2d 893, 897 (6th Cir. 1986); *see also United States v. McFarland*, 746 F.2d 1480, 1480 (6th Cir. 1984) (holding that the use of a coconspirator's photo identification violated due process when the witness and suspect had been arraigned together on a prior date and circumstances did not otherwise indicate that the identification was reliable).

Similarly, this Court has never found that an identification arising from a suggestive format was anything but *unreliable* when the witness' prior description of the suspect was significantly inconsistent with the suspect's actual appearance. *See id.*; *see also Webb*, 549 F.2d at 1086 (finding identification unreliable when prior description noted assailant had long sideburns, and identified suspect sported a mustache, but no sideburns, during the timeframe in question); *Marshall*, 499 F.2d at 1167 (finding that witness' description of suspect did not match actual physical appearance in a "crucial respect").

A custom or practice of using one-on-one show-ups indiscriminately is akin to conducting a search or seizure without an assessment of probable cause.  While circumstances do exist which may justify the use of a show-up, just like circumstances do exist which justify a search without a warrant, a practice of going through with a show-up without consideration of the circumstances has the "highly predictable consequences" of resulting in constitutional violations. *See Brown*, 520 U.S. at 409.  Eyewitness identifications are recurring situations in criminal investigations.  Officers conducting a show-up must consider the circumstances and make a reasoned determination of whether, under the totality of the circumstances, the show-up would be so suggestive that there exists a "substantial likelihood" that an "irreparable misidentification" will take place. *See Neil*, 409 U.S. at 199-200.  This Court has in the past held that a municipal practice of bypassing consideration of the circumstances in which the exercise of a city power is constitutional or not can lead to 42 U.S.C. § 1983 municipal liability. *See Sell*, 47 Fed. App'x at 695 ("If Columbus failed to instruct or train the officers responsible for emergency evictions about their constitutional responsibility to provide a hearing in all but 'extraordinary situations' . . . that shortcoming is one that is so likely to lead [to] a violation of the constitutional right to due process as to be deliberate indifference to citizens' constitutional rights, and give rise to municipal liability under § 1983.")  Not all eyewitness identification opportunities – or even the vast majority – will pass the totality of the circumstances

test such that a show-up would not lead to a due process violation.[12]  A municipality with a custom or practice of conducting show-ups without consideration of the circumstances therefore opens itself up to § 1983 liability.

The remaining question for this Court is whether the evidence, when viewed in the light most favorable to Plaintiff, is such that a reasonable jury could conclude that the City had a custom or practice of using show-ups without consideration of the circumstances, and that pursuant to this custom, Tarter employed a show-up with Plaintiff without consideration of Plaintiff's due process rights.  Plaintiff puts forth evidence that the City had a custom of using show-ups in lieu of line-ups in non-exigent circumstances.  Plaintiff's evidence includes affidavits from two police practice experts who opined that there existed systematic deficiencies in police officer training; that supervising LDP officers found it "perfectly acceptable" to conduct non-exigent show-ups days after a crime if an officer could get a suspect to sign a "waiver;" and that it was established practice to ask suspects in for a line-up, fail to take affirmative actions to constitute a line-up, and request consent to a show-up. (J.A. at 2330, 2332, 2334, 2208, 2236-38, 2241-42, 2247-50, 2275.)  Plaintiff presents further evidence that using such show-ups was expressly approved through the existence of pre-printed waiver forms.[13]  Such forms are evidence of established practice.  *See Sell*, 47 Fed. App'x at 692.  Given this evidence, we cannot say that a reasonable jury could not conclude that the City had a custom or practice of conducting show-ups without consideration of the constitutional implications of such show-ups, and thus that the City was "deliberately indifferent" to the due process rights of its citizens.  Accordingly, we reverse the district court's grant of summary judgment to the City.

## F.          MALICIOUS PROSECUTION AGAINST CLARK AND CARROLL

Plaintiff argues that the district court improperly dismissed Plaintiff's "malicious prosecution" claims against Carroll and Clark.  Plaintiff alleges that both Clark and Carroll unlawfully continued Plaintiff's prosecution by creating false investigative notes and materially misleading the court at Plaintiff's preliminary hearing following his arrest for the assault on Ms. S.  As we discussed *supra*, Part II.C in this opinion, we find that we must unpack Plaintiff's claim of "malicious prosecution" and look to the actual injury alleged in order to apply the correct legal analysis to Plaintiff's claims.

Plaintiff first alleges that Clark materially misled the court at Plaintiff's preliminary hearing and that Clark's reliance on the court's determination of probable cause was therefore unreasonable. If true, Plaintiff alleges a Fourth Amendment violation.  Plaintiff next alleges that Clark and Carroll caused his detention to be continued absent probable cause through the creation of false investigative notes.  Plaintiff implies that absent the notes' existence, probable cause for Plaintiff's continued detention would have dissolved.  This is also an allegation of a Fourth Amendment violation.  We therefore apply Fourth Amendment analysis to plaintiff's claims for continued detention without probable cause against Clark and Carroll.

---

[12]The dissent reasons that Plaintiff has failed to show a pattern or practice of illegal activity.  Yet the City's practice of "skipping" the *Neil v. Biggers* analysis shows such a pattern of illegal activity.  Given the Supreme Court's "grave concerns" over the suggestiveness of show-ups, such a practice has the "highly predictable consequences" of leading to constitutional violations, which is the applicable standard here.  Not every use of a show-up need lead to a constitutional violation for the City to exhibit "deliberate indifference" to the rights of its citizens. *See Sell*, 47 Fed. App'x at 695.

[13]The City argues in the alternative that Plaintiff "waived" his right to contest the suggestibility of the show-up when Plaintiff consented to the show-up by signing the City's pre-printed line-up "waiver" form.  The judge at Plaintiff's criminal trial agreed, but found that "the [show-up] procedure would have been unduly suggestive had there not been a waiver . . . . There would have been serious problems with it." (J.A. at 1906-07.)  As we discussed, *supra*, this take on Plaintiff's consent to the show-up misconstrues what took place and the nature of constitutional waiver.

### 1.          *Material Misrepresentations to Establish Probable Cause*

Police officers cannot, in good faith, rely on a judicial determination of probable cause when that determination was premised on an officer's own material misrepresentations to the court. *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989). Such reliance is unreasonable, and detention of an individual pursuant to such deceptive practices violates the Fourth Amendment. *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989). This Court has held investigators subject to suit under § 1983 for making materially false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest. *Id.* With Fourth Amendment rights implicated by ongoing, pretrial detention, deliberate obfuscation or omission of material facts by an investigator at the preliminary hearing makes the investigator's subsequent reliance on the hearing's conclusions unreasonable. *See Albright*, 510 U.S. at 280 (Ginsburg, J., concurring).

To establish that Clark or Carroll acted in an objectively unreasonable fashion in continuing Plaintiff's detention, Plaintiff must present evidence that the officers (1) stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause. *Hill*, 884 F.2d at 275; *see also Spurlock*, 167 F.3d at 1006 ("[A] reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain the individual was fabricated, would also be unlawful.").

At a preliminary hearing on June 15, 2002, Clark testified on direct examination that Mrs. V had twice identified Plaintiff. On cross-examination, Clark revealed that Mrs. V had failed to pick Plaintiff out of a photopak, but did not reveal that Mrs. V actually picked another photo. When asked if the police had any evidence against Plaintiff other that Mrs. V's identification, Clark responded "Not at this time." (J.A. at 1300.) When asked if Mrs. V had given a physical description of her assailant, Clark responded: "That's correct and it fits [Plaintiff.]" (J.A. at 1301.) When Plaintiff moved to dismiss for lack of probable cause, the judge denied the motion, but noted that "because of the extremely minimal burden on the Commonwealth that I'm gonna have to find probable cause but I'll state for the record it's just barely." (J.A. at 1302.)

Plaintiff argues that had Clark revealed that Mrs. V indicated another picture from the array, the judge's determination of probable cause may have swung the other way. The facts show that Mrs. V identified someone other than Plaintiff out of the photopak when asked to choose a picture of someone most closely resembling her attacker. Whether this selection by Mrs. V should have been disclosed by Clark is a question of materiality, and materiality determinations are the province of the jury when reasonable minds could differ. *Gaudin*, 515 U.S. at 512 (1995). Moreover, Clark stated on the stand that Mrs. V's description of her attacker "fit" Plaintiff, despite the fact that Mrs. V described her assailant as 5 feet 6 inches tall, with a stocky build and long, straight, oily or greasy hair while Plaintiff was actually 5 feet, 11½ inches tall and had kinky hair. A reasonable jury could infer that this conclusion by Clark was so contrary to the facts known to him at the time that this statement was a material misrepresentation to the court.[14] Further, because the court at the time of the hearing just barely found probable cause, a reasonable jury could conclude that without the "fit" testimony or with the additional exculpatory information that Mrs. V had chosen another picture from the photopak, the preliminary hearing judge would have failed to find probable cause. As such, a jury could conclude the Clark's reliance on the court's determination of probable cause was unreasonable.

---

[14]The dissent asserts that Clark "testified truthfully at the hearing." This is a factual determination for the jury, not this Court. The dissent also believes that Clark's assertion that the victim's description "fit" Plaintiff "appears reasonable." Again, this is a factual determination for the jury. We must deny summary judgment unless no reasonable jury could conclude that Clark's statements materially misled the court. Merely because a reasonable jury *could conclude* that the statements did not mislead does not mean that it would be unreasonable for the jury to *conclude to the contrary* and is not cause for this Court to take the decision away from the finder of fact.

Accordingly, the district court erred when it dismissed Plaintiff's malicious prosecution claim against Clark. Because Carroll did not testify at the preliminary hearing, and Plaintiff presents no evidence or argument that Clark's knowledge can be imputed to Carroll, the district court properly dismissed Plaintiff's claim against Carroll insofar as it goes to Carroll's actions and knowledge relating to Mrs. V's photopak identification.

Because we find that the district court improperly dismissed Plaintiff's § 1983 claim against Clark as premised on Clark's preliminary hearing testimony, we also address Clark's eligibility for qualified immunity against this claim. The district court did not reach the issue because it dismissed the claim on its underlying merits, but Clark addresses the issue in his brief to this Court (*see* Defs. Final Third Br. 14-15), and Plaintiff appears to refer to immunity when he states that "[n]o reasonable officer would have believed that probable cause existed to continue a prosecution against [Plaintiff] based on the 'evidence'" (Pl. Final Second Br. 59) in Plaintiff's argument on this issue.

Based upon the above analysis, Plaintiff has alleged a violation of a known constitutional right to be free of continued detention without probable cause. Plaintiff has presented evidence such that a jury could infer that Clark deliberately obfuscated the truth at the preliminary hearing and that such evidence is material. Hence, Plaintiff's continuing detention in reliance on the preliminary hearing findings would be unreasonable. This is a matter of fact for the jury.

### 2.    *Investigative Notes*

We reach a different conclusion on the matter of the allegedly false investigative notes. Plaintiff argues that Clark and Carroll participated in his malicious prosecution by fabricating notes which falsely recorded that Plaintiff had independent knowledge of the items stolen from Mrs. V's apartment. We find here that Plaintiff has failed to establish a *Fourth Amendment* injury from the notes' existence and creation. The notes are *inculpatory* evidence only. There is no evidence that the notes were presented to the court at the preliminary hearing and contributed to the Court's determination of probable cause to hold Plaintiff over for trial. Neither does Plaintiff point to evidence that the notes influenced any decision to proceed to trial. Without some link between the allegedly false investigative notes and Plaintiff's continued detention, Plaintiff fails to state a viable cause of action separate and apart from his fabrication of evidence claims, which, as discussed *supra*, the district court properly held could proceed under a due process theory.

We note the distinction here between Plaintiff's viable continued detention claim against Katz as premised on *Brady* violations, and Plaintiff's failed continued detention claim against Clark and Carroll as premised on fabrication of the notes. We held, *supra*, that Plaintiff could pursue *both* his *Brady* violation claim and his continued detention claim against Katz because the shared factual premise there – the concealment of exculpatory information – resulted in *both* unlawful pretrial detention and an unfair trial. Here, the fabrication of inculpatory information has no pretrial detention effect in the absence of additional evidence that the fabrications influenced the initial or continued detention. Accordingly, we find that although Plaintiff may pursue a fabrication of evidence claim based on the allegedly false investigation notes, Plaintiff has failed to establish any link between the notes and any Fourth Amendment injury.

### 3.    *Summary*

Because a jury could reasonably infer that Clark's reliance on the probable cause determination from the preliminary hearing was unreasonable in light of Clark's material misrepresentations to the court, we reverse the district court's grant of summary judgment to Clark on Plaintiff's claim for continued detention without probable cause. We also find that Clark is not entitled to qualified immunity as a matter of law against this same allegation. Because Carroll did not testify at the preliminary hearing, and Plaintiff presents no evidence that would impute Clark's knowledge to Carroll, we affirm the district court's dismissal of Plaintiff's § 1983 claims against

Carroll insofar as they reach Carroll's actions and knowledge relating to Mrs. V's photopak identification.

## III

## CONCLUSION

For the foregoing reasons, this Court **AFFIRMS** in part and **REVERSES** in part the district court's decisions in this case. We affirm the district court's denial of absolute immunity to Defendants Clark, Carroll, and Katz for their pretrial, nontestimonial acts. We also affirm the district court's refusal to grant qualified immunity to Katz and Tarter. We similarly affirm the district court's grant of summary judgment in favor of supervisory Defendants Thomas, Ammon, and Kessinger. Finally, we affirm the district court's grant of summary judgment to Defendant Carroll with respect to Plaintiff's allegations that Carroll violated Plaintiff's Fourth Amendment rights by continuing Plaintiff's detention without probable cause.

We reverse the district court, however, on its grant of summary judgment to Defendant Katz with respect to Plaintiff's allegations that Katz violated Plaintiff's Fourth Amendment rights by failing to disclose exculpatory evidence, thereby causing Plaintiff's detention to continue without probable cause. We also reverse the district court's grant of summary judgment to Defendant Clark on Plaintiff's allegations that Clark violated Plaintiff's Fourth Amendment rights by continuing Plaintiff's detention without probable cause. Finally, we reverse the district court's summary judgment for Defendant City on Plaintiff's *Monell* claims as they relate both to identification procedures and to disclosure of exculpatory evidence.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

SILER, Circuit Judge, concurring in part and dissenting in part. I concur in most of the conclusions in the majority opinion, but I respectfully dissent from a few of those conclusions for the reasons set out herein. First, I agree with the majority's conclusion that there is no supervisory liability on the part of the defendants, Luanne Thomas, Darrell Ammon, and Wayne Kessinger. Therefore, the district court correctly granted summary judgment on their behalf. I also agree that the district court correctly found that the defendants, Joe Carroll, Steve Clark, and Dawn Katz, were not entitled to absolute immunity for their pretrial alleged fabrication of evidence.

However, I disagree with the majority's conclusion that the case of *Buckley v. Fitzsimmons*, 919 F.2d 1230, 1244-45 (7th Cir. 1990), is in conflict with the law of this circuit. The *Buckley* court granted absolute immunity to an expert's pretrial activities, including the expert's evaluation of the physical evidence, written reports, discussion of the case with prosecutors, and preparation for testifying. 919 F.2d at 1244-45. Attempting to circumvent the absolute immunity protections granted to trial testimony, the plaintiff in that case had attacked the preparation of the expert testimony as a means of indirectly litigating the substance of the actual testimony given at trial. *Id.* The *Buckley* court ruled that the grant of absolute immunity for trial testimony would indeed be a "hollow immunity" if the aggrieved could so easily get around the bar, since almost all expert testimony entails extensive preparations and discussions with prosecutors. *Id.* at 1245. However, the court limited its holding by noting that absolute immunity might not apply where that expert's pretrial activities "violate[d] a suspect's rights independently," by, for example, "'cooking' a laboratory report." *Id.* The crucial factor in that case was that nothing in the complaint suggested that the expert defendants "hid evidence, as opposed to misinterpreting it." *Id.* I do not think this is inconsistent with the law of this circuit.

I also agree with the majority that the denial of qualified immunity for the defendants, Katz and John Tarter, was proper. Under the allegations by the plaintiff, Katz and Tarter would not be entitled to qualified immunity. I agree with the majority's conclusion that the district court correctly granted summary judgment to Carroll with respect to the allegations that Carroll violated Gregory's Fourth Amendment rights by continuing Gregory's detention without probable cause.

On the other hand, I differ with the majority in reversing the summary judgment granted to Katz on the Fourth Amendment malicious prosecution claim. I would instead follow the majority's reasoning in upholding the grant of summary judgment to Carroll on the malicious prosecution claim. Like Carroll, Katz did not testify at the preliminary hearing, nor was any conclusion by Katz concerning the examination of the hairs from the pantyhose brought to the attention of the court at the preliminary hearing. Given that probable cause had already been established, I do not find any authority for the proposition that after probable cause has been established a witness who knows of likely exculpatory evidence is violating the Fourth Amendment unless the witness quickly reveals that evidence to the court. Apart from the problems associated with how to determine the effect of Katz's information upon the court's previous finding of probable cause, the reasoning of the majority would create numerous practical problems since investigations often turn up a plethora of facts supporting either side's case. In effect, the duty outlined by the majority would create a requirement that a court perpetually reexamine its probable cause determination in light of each new piece of evidence collected, as any piece of evidence could theoretically affect that determination. Moreover, in articulating this proposition, the majority only relies upon two lone concurrences from the Supreme Court, *see Albright v. Oliver*, 510 U.S. 266 (1994) (Ginsburg, J., concurring and Souter, J., concurring), and a prior decision of this court involving the fabrication of probable cause by a police officer, *see Spurlock v. Satterfield*, 167 F.3d 995, 1006-07 (6th Cir. 1999). Neither of these decisions

compels the majority's result. In the end, we do not know what effect Katz's analysis would have had upon the continuing detention of Gregory, as the court had already found probable cause. Perhaps in the long run it matters very little, for the *Brady* issue is still pending against Katz and it seems an adequate vehicle through which to address any concerns about the withholding of exculpatory evidence. In closing, I would not find it to be a Fourth Amendment violation solely for Katz's failure to provide this information after the court had found probable cause without any input from her.

I also dissent from the majority's conclusion that the district court erred in dismissing the Fourth Amendment malicious prosecution claim against Clark. I agree with the district court that there was probable cause to arrest and detain Gregory. The victim had sought out an arrest warrant for Gregory and had, on two separate occasions, identified Gregory in person, although both of these identifications appear to be suspect. The question of probable cause is not proof beyond a reasonable doubt. *See United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998). Here, Clark testified truthfully at the hearing[1] and, although he did not mention that the victim had picked another picture out of a photo line-up, he did testify that the victim had been unable to identify Gregory in that photo line-up. Given this, I would not find that a Fourth Amendment violation occurred when Clark testified in the preliminary hearing. *See Darrah v. City of Oak Park*, 255 F.3d 301, 312-13 (6th Cir. 2001); *see also Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (noting that eyewitness identifications are "generally entitled to a presumption of reliability and veracity"). Although he may have had some information which was exculpatory, that is, that the complainant picked out another photograph at the first identification, he was not asked about it, and he did not lie to the court. I do not think that there is authority for the proposition that witnesses, in this context, are under an absolute duty to inform the court of any and all potential exculpatory information. *Cf. Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) ("Because the consequences of arrest or search are less severe and easier to remedy than the consequences of an adverse criminal verdict, a duty to disclose potentially exculpatory information appropriate in the setting of a trial to protect the due process rights of the accused is less compelling in the context of an application for a warrant.").[2] However, I do agree with the majority in its conclusion that the allegedly false investigative notes do not establish a Fourth Amendment injury, because the notes are inculpatory evidence only.

Finally, on the question of municipal liability, I agree with the majority that, under *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046-47 (6th Cir. 1992), Gregory has presented sufficient evidence

---

[1]Despite the majority's conclusion that Clark potentially made a material misrepresentation to the court by saying that the victim's description of her assailant fit Gregory, Clark's testimony appears reasonable especially given the broad description of the assailant tendered by the victim.

[2]The *Mays* court went on to note:

> To interweave the *Brady* due process rationale into warrant application proceedings and to require that all potentially exculpatory evidence be included in an affidavit, places an extraordinary burden on law enforcement officers, compelling them to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded. Under such a scenario, every search would result in a swearing contest with participants arguing after the fact over whether exculpatory evidence even existed.

> For these reasons, as well as to resolve any confusion resulting from prior opinions, we reiterate that except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* [*v. Delaware*, 438 U.S. 154 (1978)] is inapplicable to the omission of disputed facts.

134 F.3d at 816 (emphasis in original).

to state a claim against the City for a policy of inadequate training or supervision regarding police officers' duty to disclose exculpatory material.  However, I think that Gregory's municipal liability claim alleging that the City had a custom of using overly suggestive show-ups is not a viable claim.  In order to state a viable custom claim, a plaintiff must show, among other things, a "clear and persistent pattern of *illegal* activity" and "the defendant's tacit approval of the *unconstitutional* conduct."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (alterations and citations omitted) (emphasis added).  Here, Gregory has shown a clear and persistent pattern of one-on-one show-ups that the City tacitly approved.  However, he has not shown that these show-ups were either illegal or unconstitutional.  The Supreme Court has said that the use of one-on-one identification procedures is not always unconstitutional and must be considered on a case-by-case basis.  *See Neil v. Biggers*, 409 U.S. 188, 196-97 (1972).  Although the show-up conducted in this case may have been unconstitutional, a plaintiff  "cannot rely solely on a single instance" to prove the existence of an unconstitutional custom.  *See Thomas*, 398 F.3d at 433.  In the end, Gregory has failed to put forward facts indicating that the City had a custom of conducting unconstitutional show-ups and has therefore failed to prove a necessary element of his custom claim.

        Therefore, for all these reasons stated, I would uphold the district court in all of its rulings, except for the one ruling dismissing the City of Louisville on the policy of inadequate training or supervision concerning the disclosure of exculpatory information.