NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0465n.06

Case No. 20-1778

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

DESMOND RICKS, et al.,

    Plaintiffs-Appellees,

v.

DAVID PAUCH, et al.,

    Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Oct 13, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Before: SUTTON, Chief Judge; COLE and READLER, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** Desmond Ricks was convicted of second-degree murder based in part on a law enforcement report that matched bullets from a crime scene to a gun found in the home he shared with his mother. More than two decades later, however, the report was determined to be erroneous. After his conviction was overturned, Ricks sued three officers involved in his investigation. In addition to Michigan common law claims, Ricks asserted claims under 42 U.S.C. § 1983 for fabrication of evidence, malicious prosecution, and withholding of evidence. As to those latter claims, the district court denied the officers' motion for summary judgment based upon qualified immunity. The officers now seek interlocutory review with respect to the qualified immunity denials. We affirm in part, reverse in part, and remand for further proceedings.

I.

A.  Gerry Bennett was shot to death in 1992 in the parking lot of a Detroit restaurant.  The parties dispute what transpired that afternoon.  According to Ricks, he and Bennett drove to the restaurant together.  When they arrived, Ricks stayed in the car while Bennett and an unidentified man (who arrived in a separate vehicle) entered the restaurant together.  Ricks alleges that he saw Bennett and the man exit the restaurant approximately five to ten minutes later, at which point the unidentified man shot Bennett in the stomach and head.  The defendant officers contend that Ricks entered the restaurant with Bennett.  After the men exited the restaurant, the men argued, at which point Bennett was shot.  According to the officers, no vehicle other than Bennett's was in the parking lot.  The parties agree, however, that Ricks fled the scene after the shooting, and that he removed his jacket as he ran away.

Two days after the shooting, Ricks was arrested at the home he shared with his mother.  Ricks's mother told officers that her son was not involved in the murder.  She also said that the only gun in the home, which she kept in her bed under her pillow, belonged to her.  With Ricks's mother's permission, officers seized the handgun, a Rossi .38 Special 5-shot revolver.  Donald Stawiasz, the officer in charge of the investigation, sent the gun to a crime lab for testing.

Around the same time, a medical examiner performed an autopsy on Bennett.  During the autopsy, the examiner removed two bullets from Bennett's body—one from his brain and one from his spine.  The examiner placed each bullet into separate envelopes.  He then gave them to a liaison with the Detroit Police Department, who in turn gave them to Stawiasz.  Stawiasz put the bullets in a larger evidence envelope and sent them to David Pauch, a firearm and toolmark examiner in the Department's crime lab.

Pauch examined both bullets recovered from Bennett's body and the Rossi handgun. Part of the examination involved determining the "rifling characteristics" of each bullet, including the number of "lands" and "grooves," the unique markings a gun barrel makes on a bullet it fires. Together with "twist"—the direction (right or left) the bullet spins when fired—lands and grooves are indicators used to classify a bullet and match it to the gun from which it was fired. Pauch's report indicated that the Rossi handgun was classified as "6R," meaning bullets fired from the gun have six lands and grooves that show rightward twist. On the evidence bullets removed from Bennett, however, Pauch initially was able to identify only "traces of lands and grooves"— meaning he could not determine the number of markings—because the bullets were "damaged." Pauch's report indicates he then performed a microscopic analysis of the test and evidence bullets and concluded that all four bullets were fired from the Rossi handgun. After an independent comparison of the respective bullets, Pauch's supervisor, Robert Wilson, reached the same conclusion and signed off on Pauch's report.

Following his arraignment, Ricks retained David Townshend, a retired Michigan State Police firearms examiner, as an expert. Stawiasz brought the evidence to Townshend's lab. Townshend test-fired the Rossi handgun and microscopically examined his test bullets and the evidence bullets that Stawiasz provided. He concluded that the evidence bullets were fired from the Rossi handgun. At the time, Townshend believed the bullets Stawiasz gave him may have been test bullets because they were in "very good condition" and "didn't look like" they had been removed from a victim. But when he asked Stawiasz if they were the "evidence bullets," Stawiasz responded affirmatively. Townshend, however, did not make note of this inquiry in his report.

The ballistic evidence would be paramount at Ricks's trial. During closing arguments, the prosecutor emphasized that the case "[came] down to really one thing, one piece of the evidence,

and that is this gun here." The Rossi handgun, the prosecutor explained, was the gun that killed Bennett and the gun "found at [Ricks's] house." The jury convicted Ricks of both second-degree murder and a felony firearm offense, and the court issued a sentence of 32 to 62 years of imprisonment. Ricks's direct appeals were unsuccessful, as was his first motion in state court for relief from judgment.

B. In June 2016, Ricks filed a successive motion in state court for relief from judgment. The basis of his motion was an affidavit by Townshend that questioned the legitimacy of the evidence bullets he examined in conjunction with Ricks's prosecution. A year earlier, the University of Michigan Law School's Innocence Clinic had sent Townshend digital photographs of the evidence bullets allegedly recovered from Bennett. According to Townshend, the bullets shown in the photos were "severely mutilated and extensively damaged" and were not the ones he examined previously. The bullets, moreover, appeared to be "in such a mutilated and damaged condition" that it was "doubtful that a positive identification with a suspect firearm would be possible." Accordingly, Townshend recommended "[a] new examination of the evidence."

The trial court ordered the Michigan State Police Crime Lab to re-evaluate the evidence bullets. Dean Molnar, the officer assigned to perform the examination, was unable to examine the Rossi handgun or create test bullets because the Detroit Police Department previously destroyed the gun. Molnar could, however, examine the evidence bullets. But his initial analysis was inconclusive. Although Molnar was able to identify the bullets as .38 caliber and as showing a right twist, he could not classify the bullets more definitively (that is, he could not count the lands and grooves) or say whether they were fired from the same gun due to damage to the bullets. After the Michigan State Police instructed Molnar to perform additional testing, Molnar determined that

while one bullet was still too damaged to count the lands and grooves, the other bullet had five lands and grooves with a right twist.

Based on Molnar's findings, the trial court granted Ricks's motion. A 5R bullet, the court explained, could not have been fired from a 6R gun like the Rossi handgun, which contradicted the Department's earlier conclusions and "undermine[d] the reliability of the firearms evidence used to convict" Ricks. The court thus vacated Ricks's convictions and ordered a new trial. And when the State of Michigan declined to prosecute, the case against Ricks was dismissed.

C. After his release, Ricks and his two daughters sued Pauch, Wilson, and Stawiasz. Ricks also sued the City of Detroit, but the parties later stipulated to dismiss the City as a defendant. As relevant here, Count I, which invoked § 1983, alleged that the officers violated Ricks's constitutional rights by fabricating evidence, engaging in malicious prosecution, and withholding evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). As to his fabrication of evidence claim, Ricks alleged that the officers did so in two different ways: first, that all three officers falsified evidence during the Department's examination to create a positive match between the evidence bullets and the Rossi handgun; and second, that Stawiasz deliberately gave Townshend test bullets rather than the real evidence bullets.

During discovery, each party's experts examined the evidence bullets. Ricks's first expert, Townshend, determined that both bullets "exhibit[ed] class rifling characteristics of 5 lands and grooves with a right twist." He therefore concluded that the Rossi handgun, which "has class rifling characteristics of 6 lands and grooves with a right twist," could not have been the gun that fired the two evidence bullets. Townshend also described the "misidentification" of the evidence bullets as "a catastrophic error" that "would never be made by a competent qualified firearms examiner, let alone two firearm examiners." He further opined that "an error of this magnitude

5

could only have been caused by incompetency of the firearms examiners, or a deliberate attempt to mislead on the part of the two Officers involved in this case."

Ricks's other expert, David Balash, a former firearm and toolmark identification expert for the Michigan State Police, reached similar conclusions. Although he found the evidence bullets to be "badly damaged," he was able to discern that each had five lands and grooves with a right twist. And because the Rossi handgun "has class rifling specifications of 6 lands and grooves with a right twist," it "could not, and did not, fire the two evidence bullets" at issue. Balash was also highly critical of Pauch and Wilson, asserting that the two officers only could have concluded that the evidence bullets matched the Rossi handgun if they were "totally incompetent or the wrong conclusion was intentional."

The officers' expert, Jay Jarvis, a former firearm and toolmark identification expert with the Georgia Bureau of Investigation, saw things similarly. Like Townshend and Balash, Jarvis concluded that each evidence bullet had "rifling characteristics of five lands and grooves with a right twist," and thus could not have been fired from a 6R gun like a Rossi handgun. Indeed, Jarvis "would be very shocked" if two individuals who conducted complete examinations "could come to the same wrong conclusion," suggesting to him that such a conclusion could only be "a horrible mistake" or "deliberate."

Following discovery, the parties filed cross-motions for summary judgment. The district court denied both motions as to all claims, including the officers' request for qualified immunity. In so doing, the court concluded that questions of material fact existed as to whether Pauch and Wilson intentionally fabricated evidence and as to whether Stawiasz deliberately gave Townshend test bullets instead of the true evidence bullets.

The officers subsequently moved for reconsideration, which the district court likewise denied. Relevant there was the court's acknowledgement that it incorrectly stated in its opinion that "Stawiasz was 'present' when Pauch test fired bullets from the Rossi handgun on March 6, 1992." But that mistake was "immaterial," the court explained, because the misstatement did not alter its conclusion that "Stawiasz had the means and opportunity to switch the bullets when he brought them to Townshend for testing," and thus that Stawiasz was not entitled to qualified immunity on the fabrication of evidence claim. The officers now appeal the district court's denial of qualified immunity as to Ricks's constitutional claims.

II.

Qualified immunity protects federal and state officials performing discretionary functions from liability for civil damages for constitutional violations. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome a qualified immunity defense, a plaintiff must show that the official violated a constitutional right that was "clearly established at the time" of the official's conduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact,' that is, 'evidence on which [a] jury could reasonably find for the plaintiff.'" *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 608–09 (6th Cir. 2015) (alteration in original) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252, 256 (1986)). When determining whether a right was clearly established, we examine whether the law was "sufficiently clear that a reasonable official would [have understood] that what he [was] doing violate[d] that right." *Tlapanco v. Elges*, 969 F.3d 638, 648 (6th Cir. 2020) (internal quotation marks and citation omitted). In cases with multiple defendants, we assess qualified immunity "in the context of each individual's specific conduct." *Hopper v. Plummer*,

887 F.3d 744, 756 (6th Cir. 2018) (internal quotation marks and citation omitted). And we review the district court's denial of summary judgment on qualified immunity grounds de novo. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 275 (6th Cir. 2020).

We have jurisdiction to review a district court's denial of qualified immunity "to the extent that [decision] turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). To that end, we "may decide an appeal challenging the district court's *legal* determination that the defendant's actions violated a constitutional right or that the right was clearly established." *DiLuzio*, 796 F.3d at 609. We may also consider, "as a *legal* question, an appeal challenging the district court's factual determination insofar as the challenge contests that determination as 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). But our jurisdiction is limited—we may not consider an appeal challenging the denial of qualified immunity "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). To the extent that "legal and factual challenges are confused or entwined, 'we must separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is "genuine").'" *DiLuzio*, 796 F.3d at 610 (quoting *Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014)).

A. We begin with Ricks's fabrication of evidence claim. That claim is "an allegation that a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (alterations in original) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)). The officers do not contest that it was clearly established in 1992 that fabricating evidence to create probable cause to detain a suspect would have violated the

8

suspect's Fourth Amendment right to be free from unreasonable seizures. *See Spurlock v. Satterfield*, 167 F.3d 995, 1005–07 (6th Cir. 1999) (recognizing that this right was clearly established as early as 1990). Rather, they argue that the evidence, even when viewed in a light most favorable to Ricks, does not show that the officers knowingly or intentionally fabricated evidence. *See DiLuzio*, 796 F.3d at 609 (explaining that whether a defendant's actions amount to a constitutional violation is a legal question we may review on interlocutory appeal). We disagree.

1. Start with Pauch and Wilson. Although the qualified immunity analysis requires an individualized assessment of each defendant's conduct, *Hopper*, 887 F.3d at 756, we examine Pauch's and Wilson's actions together because neither party meaningfully distinguishes the two defendants' conduct. Ricks alleges that the two officers fabricated evidence by intentionally finding a positive match between the evidence bullets and the Rossi handgun. The record evidence, when viewed in the light most favorable to Ricks, supports that allegation. For starters, four analyses concluded that the officers incorrectly matched the evidence bullets to the Rossi handgun. And, viewed in the light most favorable to Ricks, the record indicates the officers' error was so egregious that a jury could find their actions were knowing or intentional. One of Ricks's experts found the officers' error so "catastrophic" as to be incompetence at best and intentional misconduct at worst, surmising "an error of this magnitude would never be made by a competent firearms examiner, let alone two firearm examiners." Even the officers' own expert believed that their conclusion was either "a horrible mistake" or "deliberate."

Other aspects of the record support the experts' conclusions that Pauch and Wilson may well have intentionally fabricated evidence. For instance, the officers failed to record notes of any kind during their examination, which, according to Balash, departed from the long-existing "foundation[] of Firearms Identification" that examiners document their process for later review.

Ricks was also in custody prior to Pauch and Wilson's examination, offering a potential motive to link the bullets to the gun recovered from Ricks's mother's home. Viewing this collection of evidence in the light most favorable to Ricks and drawing all reasonable inferences in his favor, a jury could reasonably conclude that the officers knowingly fabricated the match between the evidence bullets and the Rossi handgun. And as the officers do not dispute that their report affected the jury's judgment, Ricks has provided sufficient evidence to establish a viable constitutional violation. *See Mills*, 869 F.3d at 484.

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006), is a helpful guide. In *Gregory*, a forensic examiner reported that she had recovered five hairs from the scene of a rape, all of which matched Gregory's hair. *Id.* at 732. But years later, the examiner testified that she had also found (and did not disclose) two non-matching hairs. *Id.* That testimony, combined with DNA testing revealing that none of the hairs in fact came from Gregory, led to Gregory's conviction being overturned. *Id.* at 735. During Gregory's subsequent § 1983 suit, an expert opined that the examiner's conclusions were "far afield of what any reasonable forensic examiner would find from the evidence." *Id.* at 744. From that testimony, we concluded there was "sufficient evidence from which a jury might reasonably infer that [the examiner] fabricated her report." *Id.* So too here, where a trio of experts agree that Pauch and Wilson's conclusion was blatantly erroneous and perhaps even the product of intentional misconduct.

Resisting this conclusion, the officers instead direct us to *Caminata v. County of Wexford*, 664 F. App'x 496 (6th Cir. 2016). Caminata's arson conviction was overturned following allegations of improprieties during her prosecution, including that the fire investigator's analysis was flawed. *Id.* at 498–99. The investigator, however, was entitled to qualified immunity in Caminata's subsequent § 1983 suit alleging fabrication of evidence because there was

10

"no evidence to suggest that [the investigator's] report contained deliberate omissions," as opposed to "huge mistakes" that "impugn[ed] the quality of [the] investigation." *Id.* at 501–02. But Pauch and Wilson's report, as the district court noted, "has not simply been 'impugned,' . . . [it] has been indisputably shown to be wrong." And while Caminata "offered no testimony" suggesting that the fire investigator deliberately fabricated evidence, *id.* at 501, multiple experts have indicated here that the officers may well have engaged in intentional misconduct.

The rigor of Pauch and Wilson's report further distinguishes Ricks's case from *Caminata*. While the investigator in *Caminata* "spent multiple hours at the site, produced an eight-page report of his findings," and then performed a follow-up investigation and wrote a supplemental report, *id.*, Pauch and Wilson took no notes during their investigation and produced a single-page report. In other words, while the record in *Caminata* at best revealed an investigator's negligence, *id.*, a reasonable jury could draw a harsher conclusion as to Pauch and Wilson's actions.

The officers' remaining arguments are similarly unpersuasive. For example, they point out that because Molnar, like Pauch and Wilson, initially could not count the number of lands and grooves on the damaged evidence bullets, impugning Pauch and Wilson's conclusions also impugns Molnar's examination, which no one considers flawed. But regardless of Molnar's findings regarding the evidence bullets, three ballistics experts, including the officers' own expert, opined that Pauch and Wilson's shared conclusion that the evidence and test bullets matched was so erroneous as to suggest deliberate fabrication. And on a motion for summary judgment, we cannot wholly discount these expert opinions by weighing them against Molnar's findings, *Anderson*, 477 U.S. at 255, nor can we examine such evidentiary disputes in this setting, *DiLuzio*, 796 F.3d at 610.

The officers also characterize the various experts as merely speculating that errors in Pauch and Wilson's report could have come from intentional conduct, which, they say, is not enough to permit an inference of deliberate fabrication. But the officers both understate the record and ignore the favorable light in which we must view it. *Moldowan v. City of Warren*, 578 F.3d 351, 370 (6th Cir. 2009). As noted, both Townshend and Balash stressed it was unlikely that two trained officers would unintentionally make such grave errors. And Jarvis, the officers' own expert, similarly thought the conclusion was either "a horrible mistake" or "deliberate." Especially when viewed in the light most favorable to Ricks, this record could lead a reasonable jury to conclude that Pauch and Wilson deliberately fabricated evidence. *See Gregory*, 444 F.3d at 744 n.8.

2. Next up are the claims as to Stawiasz. Ricks alleges that Stawiasz fabricated evidence in two ways: one, by falsifying evidence alongside Pauch and Wilson during the Department's initial testing of the evidence; and two, by giving Townshend test bullets rather than the real evidence bullets for his independent examination. In denying Stawiasz qualified immunity on Ricks's "fabrication of evidence claim," however, the district court analyzed only the latter allegation. On appeal, Stawiasz argues that the district court should have analyzed each fabrication claim separately and granted qualified immunity on both claims.

As an initial matter, we agree that the district court should have assessed whether Stawiasz was entitled to qualified immunity as to each fabrication of evidence claim. We did the same in *Webb v. United States*, 789 F.3d 647, 667–70 (6th Cir. 2015), which involved fabrication claims asserted against multiple defendants stemming from different instances. In assessing those allegations, we considered whether summary judgment was proper as to each defendant for each alleged incident. *See id*. Taking that same approach here leads us to conclude that Stawiasz is entitled to qualified immunity on the initial testing fabrication claim. Ricks did not put forth

sufficient evidence to show that Stawiasz participated in Pauch and Wilson's alleged fabrication in creating their report. As the district court acknowledged (and Ricks does not contest), Stawiasz was not present during Pauch and Wilson's testing. With no evidence connecting Stawiasz to Pauch and Wilson's alleged testing fabrication, Stawiasz is entitled to qualified immunity on this claim. *See Bey v. Falk*, 946 F.3d 304, 316 (6th Cir. 2019) (reversing a denial of qualified immunity where "there [was] no evidence that [the officer] personally participated in or directed" the alleged constitutional violation).

We see no error, however, in denying Stawiasz qualified immunity on the claim that he fabricated evidence by giving Townshend test bullets instead of the real evidence bullets. Stawiasz was the officer who delivered the evidence to Townshend, which, as Stawiasz concedes, created the means and opportunity to swap the bullets. There is evidence that the bullets Stawiasz provided to Townshend differed from the bullets recovered from Bennett. Townshend testified that the bullets he examined in 1992 were in "very good condition" and did not appear to have been removed from a victim. Pauch, meanwhile, described the evidence bullets he examined as "damaged." So too did multiple experts who later examined the bullets. But when Townshend asked Stawiasz whether the non-damaged bullets were the actual evidence bullets, Stawiasz confirmed that they were. And Stawiasz, keep in mind, was the officer who previously forwarded the damaged evidence bullets to Pauch.

Viewing this evidence in the light most favorable to Ricks and drawing all reasonable inferences in his favor, a jury reasonably could find that Stawiasz knowingly or intentionally gave Townshend test bullets rather than the real evidence bullets. And that fabrication could have led Townshend to make an incorrect positive identification in line with Pauch and Wilson's report.

13

*See Mills*, 869 F.3d at 484–85. Stawiasz therefore is not entitled to qualified immunity on the bullet-swap fabrication claim.

3. All three officers also fault the district court for "predicat[ing] its adverse ruling . . . on reckless, not intentional, conduct," because, according to the officers, there was no clearly established law in 1992 holding that reckless conduct was sufficient for a fabrication of evidence claim. We see no error of law in the district court's articulation of the fabrication of evidence standard. That standard customarily requires knowing or intentional conduct by the alleged fabricator, a standard referenced throughout the district court's opinion. *See, e.g.*, *Mills*, 869 F.3d at 484. While the court did make a handful of references to a culpability level of recklessness, it did so in the context of describing *Caminata*, which involved both fabrication of evidence and malicious prosecution claims. *Caminata*, 664 F. App'x at 500. *Caminata*, however, properly recited separate standards for each claim, recognizing that fabrication requires knowing conduct whereas malicious prosecution can be established through deliberate or reckless conduct. *See id*. From there, we perhaps confused the issue by combining our analysis of those claims in affirming the award of qualified immunity, explaining that the record was "insufficient to establish knowing fabrication or deliberate or reckless falsehoods, rather than mere negligence." *Id.* at 501. But that arguable imprecision had little impact here. At most, the officers identify a single statement from the district court's opinion that itself may have been imprecise: that there was a question of fact as to whether the officers "'intentionally,' or, at least, 'recklessly' falsified or fabricated the conclusion in their report." But even there, the district court correctly acknowledged that a question of fact remained as to whether the officers acted intentionally or knowingly, which was enough to overcome the officers' assertion of qualified immunity. Any reference to whether the

14

officers may have acted recklessly does not warrant reversal when read in context of the court's entire analysis.

B. Nor are the officers entitled to qualified immunity on Ricks's malicious prosecution claim. A claim for malicious prosecution under the Fourth Amendment "encompasses wrongful investigation, prosecution, conviction, and incarceration," *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (internal quotation marks and citation omitted), and has four elements: (1) the defendant "made, influenced, or participated in the decision to prosecute" the plaintiff; (2) the prosecution lacked probable cause; (3) the proceeding caused the plaintiff to experience a deprivation of liberty; and (4) the proceeding was "resolved in the plaintiff's favor," *Jones v. Clark County*, 959 F.3d 748, 756 (6th Cir. 2020) (quoting *Sykes*, 625 F.3d at 308–09); *see also Sykes*, 625 F.3d at 310 (explaining that the constitutional malicious prosecution claim is distinct from the similarly named tort and may be better described as a claim for "unreasonable prosecutorial seizure" (citation omitted)); *Lester v. Roberts*, 986 F.3d 599, 606–07 (6th Cir. 2021) (criticizing the "malicious-prosecution label"); *Tlapanco*, 969 F.3d at 658–60 (Thapar, J., concurring) (same).

The officers do not contest the nature of the malicious prosecution precedent as established in 1992. They instead emphasize the error in the district court's fabrication of evidence analysis, observing that the alleged facts underlying that claim also underlie the malicious prosecution claim. But given our conclusion that no officer is entitled to qualified immunity as to all of Ricks's fabrication of evidence claims, and in view of the officers' concession that their success on the malicious prosecution claim "is tied to [the] resolution of the fabrication claim," the officers are not entitled to qualified immunity on Ricks's malicious prosecution claim.

C. Lastly, Pauch and Stawiasz argue that they are entitled to qualified immunity on Ricks's claim that they withheld evidence in violation of *Brady v. Maryland* and its progeny. (Ricks did

15

not bring this claim against Wilson.)  A *Brady* claim has three elements:  (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  We have previously held that the *Brady* obligation not to suppress evidence favorable to the accused extends to police officers and is an obligation that was clearly established no later than August 1990.  *Moldowan*, 578 F.3d at 377, 382.

The officers press two arguments on appeal.  First, they contend that Ricks's *Brady* claim fails because the record does not show the officers "intentionally fabricated evidence . . . and then failed to disclose it."  But as already explained, the record when viewed in the light most favorable to Ricks supports the conclusion that Pauch fabricated evidence during his initial testing and report and that Stawiasz fabricated evidence by giving Townshend test bullets instead of the real evidence bullets.  Because a jury could reasonably conclude that each officer knowingly fabricated evidence, it could also reasonably conclude that the officers were aware that the bullet evidence was exculpatory and chose not to share that information with Ricks, which plainly prejudiced him, thereby violating his clearly established constitutional right as articulated in *Brady* and related cases.  *Strickler*, 527 U.S. at 281–82.

Second, the officers argue that Ricks cannot bring both a fabrication of evidence claim and a *Brady* claim because "no clearly established law in 1992 established separate due process claims" for those wrongs "when both claims are based on the same factual predicate."  That assertion, however, misapprehends the purpose of qualified immunity.  "Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their *conduct* is unlawful."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (emphasis added) (internal quotation marks and citation

omitted). And here, reasonable officers would have known that both fabricating evidence against Ricks and withholding evidence from him was unlawful. *See Spurlock*, 167 F.3d at 1005–07 (fabrication of evidence); *Moldowan*, 578 F.3d at 377, 382 (withholding evidence).

Nor, for that matter, are Ricks's claims "duplicative." His fabrication claim is based on allegations that the officers falsely matched the evidence bullets and the Rossi handgun and switched the bullets given to Townshend. His *Brady* claim, on the other hand, is based on allegations that the officers knew (but failed to disclose) that the evidence bullets did not match with the Rossi handgun. We have previously allowed parties to bring claims of this nature in the same suit. *See Mills*, 869 F.3d at 485 & n.4 (distinguishing a plaintiff's *Brady* claim from his fabrication claim); *see also Jackson v. City of Cleveland*, 925 F.3d 793, 815–17 (6th Cir. 2019) (reviewing a plaintiff's fabrication and *Brady* claims without suggesting that bringing both claims was improper); *Gregory*, 444 F.3d at 744–45 (same). Accordingly, the officers' assertion of qualified immunity as to Ricks's *Brady* claim also lacks merit.

III.

We affirm in part, reverse in part, and remand for further proceedings.